S12P0710. BARRETT v. THE STATE.
(733 SE2d 304)

HINES, Justice.

A jury convicted Winston Clay Barrett of malice murder and related crimes and recommended a death sentence for the murder after finding beyond a reasonable doubt the following statutory aggravating circumstances: the murder was committed while Barrett was engaged in the commission of an aggravated battery, and the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture and an aggravated battery to the victim before his death and manifested the defendant's depravity of mind.[1] See OCGA §§ 17-10-30 (b) (2), (7); 17-10-31 (a). The trial court denied Barrett's motion for new trial, and he appeals. For the reasons set forth below, this Court affirms.

1. The evidence showed the following. At approximately 5:30 a.m. on August 4, 2002, two Towns County deputy sheriffs drove through

---

[1] Barrett committed the crimes on August 4, 2002. A Towns County grand jury indicted him on December 3, 2002, charging him with malice murder, aggravated assault, aggravated battery, and two counts of possession of a firearm during the commission of a felony. The State filed written notice of its intent to seek the death penalty on February 3, 2003. The voir dire examination began in Towns County on July 12, 2004. The trial court granted Barrett's motion for a change of venue on July 27, 2004. The trial was recommenced in Hall County with jury selection beginning on March 7, 2005. The jury found Barrett guilty of all counts of the indictment on March 22, 2005, and recommended a death sentence for the malice murder conviction the following day. In addition to the death sentence, the trial court sentenced Barrett to 20 years in prison for aggravated battery and five years in prison for one count of possession of a firearm during the commission of a felony, with all sentences to be served consecutively. The aggravated assault conviction and the remaining possession conviction merged with the other convictions. Barrett filed a motion for new trial on April 18, 2005, which he amended on October 20, 2008, and which the trial court denied on November 21, 2011. Barrett filed a notice of appeal on November 30, 2011. The appeal was docketed in this Court on January 4, 2012, for the April 2012 term of this Court. The case was orally argued on April 16, 2012.

Clay Barrett's neighborhood in Hiawassee after receiving a 911 call reporting that gunshots had been fired in the vicinity. When one of the deputies saw a light at Barrett's residence, they stopped to investigate and discovered the body of Danny "Stumpy" Youngblood outside the home lying face-up in a pool of blood with "obvious brain matter" lying beside him. Youngblood, who was 5′ 7″ tall and weighed 204 pounds, had been pistol-whipped and badly beaten, had a large gunshot wound to the back of his head, and had a severe wound to his right eye. Barrett, who is 6′ 7″ tall and weighed 250 pounds at the time of the crimes, was inside the home sitting in a reclining chair watching television. When one of the deputies came to the doorway, Barrett told him, "I just shot a man. I just shot Stumpy." The deputy inquired about a weapon, and Barrett told him that it was outside. When the deputy asked Barrett exactly where outside the weapon was located, Barrett lifted his left leg, displayed a nine-millimeter pistol, and tossed it onto the chair beside him. When additional law enforcement personnel arrived, Barrett refused their request that he move outside in order for them to conduct their investigation. As the officers assisted him out of his chair, they discovered that Barrett had a holster attached to his right side that contained a loaded .357 revolver, which was later determined to be the weapon that killed Youngblood.

Jeanine Barrett testified that on August 4, 2002, she and Barrett had been married for approximately one year and that she had met Youngblood only one time prior to the weekend that the shooting occurred. According to her testimony, the following events preceded Youngblood's death. The previous day, she placed Barrett's .357 revolver in a pocket of his reclining chair after finding it lying on a bed in their home. At approximately 9:00 p.m., she and her 13-year-old son were driving home when they saw Barrett and Youngblood together in Youngblood's truck headed away from the Barretts' residence. She stopped and briefly spoke to them. Youngblood was driving, and both he and Barrett appeared to be intoxicated. At approximately midnight, Ms. Barrett returned her son to his grandmother's home in Gwinnett County where he lived, and when she returned home approximately four hours later, she found Barrett and Youngblood asleep in reclining chairs. She lay down on a bed in the same room, as the home consisted of only one large room and a bathroom.

At approximately 5:00 a.m., Ms. Barrett heard Barrett get up and stagger around the room until he found the bathroom, went in, and closed the door. Almost immediately, Youngblood awoke. Moaning and groaning, he stumbled around the room and then urinated on the television and floor. Ms. Barrett yelled at him that he was not in

the bathroom. Youngblood staggered toward the bathroom but stopped at the door and started to lower his pants. Thinking that he was about to defecate on the bed, Ms. Barrett yelled again and pushed Youngblood, who then tried to lie down beside her. Ms. Barrett told him that her husband had put a mattress on the floor for him to lie down on, and then she got up from the bed and started yelling at him to leave. She opened the home's only exterior door and pushed Youngblood toward it, but when she got him to the door, he stopped and said, "No, no, I'm here with Clay. I don't have to."

Youngblood continued to stumble around the room, and Ms. Barrett "rant[ed] and rav[ed]" trying to get him to leave. She finally kicked the bathroom door to get her husband's attention. Youngblood "balled up" his fist and said, "F--- you, b----," but Ms. Barrett explained that he only clenched his fist and did not draw it back as if he intended to strike her, that he was not threatening to her, and that she did not feel threatened by him. In response, Barrett came out of the bathroom in a rage, grabbed Youngblood, and pushed him toward the door, cursing and demanding that he leave. Youngblood repeatedly said, "No, Clay," and stopped himself in the doorway. The more he resisted, the angrier Barrett became, and Ms. Barrett told both of them to leave.

Then Youngblood sat down on the corner of the bed, lowered his head, and shook it, saying, "Oh, Clay, I didn't know." Barrett pulled him off the bed and started hitting him. Youngblood did not resist or fight back, and Barrett "just started throwing him around like a rag doll." Barrett threw Youngblood out the door, and Ms. Barrett heard a lot of "oh's" and "banging around" in the gravel drive outside. Barrett threw Youngblood back inside the residence and onto the floor, hitting him repeatedly with his fists and his nine-millimeter pistol. Both Youngblood and Ms. Barrett begged Barrett to stop, but Barrett pulled Youngblood up and threw him out the door and then back into the residence again, still beating him and slamming his head on the floor, on the table, and under the television. Then Barrett jumped on top of Youngblood and sat on his stomach, straddling him. When Ms. Barrett saw that Youngblood's head looked like it was "split from one side to the other in a couple of places" and that he was bleeding from his head, his mouth, and his nose, she begged Barrett to "stop it" and to "let him go" before he killed Youngblood, whom she described as helpless and "out of it." Instead, Barrett remained on top of Youngblood, looked at his wife, and then "reared back with his hand way up," "jabbed it down in [Youngblood's] eye," and "ramm[ed] his finger like he was trying to ram his hand through [Youngblood's] eye socket." When she saw "blood squirt[ ] up yea high," Ms. Barrett went to get help, as the Barretts had no telephone. As she was driving her

car out of the drive, she saw Youngblood stagger to the door and then saw Barrett grab him at both shoulders and yank him back inside. When Ms. Barrett returned with Davis Sutton, Barrett's long-time friend, Youngblood was lying dead between his truck and the residence.

Barrett, who also testified at trial, described the events preceding Youngblood's death as follows. Youngblood came to his home in the late afternoon of August 3, 2002, "agitated" and "angry" as the result of a recent altercation involving his girlfriend and his cousin. Barrett refused Youngblood's request to borrow a gun in order "to go shoot these people." The two men went target shooting with Barrett's nine-millimeter pistol instead. Later, they met Ms. Barrett on the road as she was coming home and they were leaving to buy some beer at a convenience store, which they consumed en route to a bar in Helen, where they each consumed more alcohol. They returned to the Barretts' home at approximately midnight and fell asleep in reclining chairs. Sometime later, Barrett woke up when he thought he heard a gunshot. Youngblood was in the middle of the room with Barrett's nine-millimeter pistol in his hand, and the door to the home was open. Barrett told Youngblood to give him the gun and to go back to sleep.

Barrett awoke and went to the bathroom at approximately 5:00 a.m. When he heard Youngblood and his wife arguing, he came out of the bathroom and tried to calm down an "agitated" Youngblood by telling him: "It's okay. Don't worry about it. Just go on home." When Youngblood would not leave, Barrett asked Ms. Barrett to "go call the police," but Youngblood blocked the doorway and refused to let Ms. Barrett out. Barrett and Youngblood began shoving each other, the shoves turned into blows, and a fistfight erupted. Barrett claimed that Youngblood was attempting to strike him with a ceramic wind chime when he kicked it out of Youngblood's hand, retrieved it, and hit Youngblood over the head with it. He also claimed that Youngblood threatened to kill him and was attempting to pick up Barrett's loaded .357 revolver, which he alleged was lying on the floor, when he struck Youngblood once "[n]ot real hard" on the side of the head with the nine-millimeter pistol. During the melee, Ms. Barrett managed to get out the door, and when Barrett heard an automobile crank up, he assumed that she was going to a pay phone to call the police.

Once Barrett "finally got [Youngblood] out of the house to stay," he went inside and sat in his chair, where he watched Youngblood through the open doorway as he sat on the porch facing Barrett. After "a little lull," Barrett said, "Stumpy, go get in your truck and leave, . . . or I'll have to shoot you." It appeared to Barrett that Youngblood was dragging a rock with his left foot, and Barrett unholstered the .357 revolver and came "pretty fast" at Youngblood, kicking him in the

stomach with enough force to move him from one side of the porch to the other. Youngblood landed on his back on the ground between his truck and the residence. Barrett approached him, and, while standing 12 to 18 inches from his feet, held the gun with both hands at belt level with his finger on the trigger and told Youngblood to "just stay there" until the police arrived. Youngblood lunged toward Barrett, and Barrett jerked back and fired the gun "without thinking." Barrett admitted that Youngblood never got to his feet and that he knew that Youngblood did not have a firearm. After the shooting, Barrett opened the door to Youngblood's truck to go for help. When he did not see the key inside, he went back into his home, showered, and waited for the police.

Although Barrett testified that he fired only one shot, two neighbors testified to being awakened by one gunshot, followed by someone saying, "Oh," which was quickly followed by another gunshot. A third neighbor testified that he was awakened by what he thought was a gunshot between 5:00 and 5:30 a.m.; that he moved to his porch and heard voices, "one loud and agitated and one very soft"; that the loud, agitated voice said, "Get in the f------ truck or I will kill you"; and that there was "a slight, slight pause" followed by "another shot, which [he] identified positively as a shot." The State presented evidence that a projectile that was fired from Barrett's .357 revolver entered through the open exterior door of the Barretts' home from outside the residence and came to rest in the wall behind the door.

According to the medical examiner, in addition to the gunshot wound that caused his death, Youngblood sustained over 40 injuries, including those that were consistent with his being struck on the head with a pistol multiple times, with his right eye being forcefully jabbed with a finger or fist while his head was on the ground, with his being grabbed under both armpits, with his back being scraped on a gravel drive, with his being kicked or stomped in the abdomen with a significant amount of force, and with his being kicked or stomped on the leg. Additionally, Youngblood had numerous contusions and abrasions above his navel and on his chest, abdomen, elbows, arms, wrists, legs, and feet. Several witnesses who saw Barrett immediately after the incident testified that they noticed either no or insignificant injuries to him.

The evidence also showed that there was a significant amount of blood inside and outside the residence, including on the carpet, door casings, wall, television, exterior door, and porch. Blood spatter evidence inside the home and at the rear of Youngblood's truck indicated that repeated blows capable of causing medium velocity spatter occurred in both places. DNA from blood recovered from both pistols matched Youngblood's DNA. The evidence also showed that

the shooting occurred at the driver's side door of Youngblood's truck and that Youngblood was below the top edge of the door frame at the time. A blood "swipe" was present on the driver's side door just below the lock. There were no large rocks or weapons found on or near Youngblood's body. Based on this evidence and the medical examiner's testimony that the entrance gunshot wound was a contact wound behind the right ear, the State argued that a severely intoxicated and badly beaten Youngblood was trying to comply with Barrett's ultimatum and was at the door of his truck when Barrett put the gun to the back of his head and shot him.

The jury was authorized to disbelieve Barrett's testimony and credit the testimony of the State's witnesses.[2] See *Allen v. State,* 290 Ga. 743, 744 (1) (723 SE2d 684) (2012). After reviewing the evidence in the light most favorable to the jury's verdicts, we conclude that it was sufficient to authorize a rational trier of fact to find Barrett guilty of the crimes charged beyond a reasonable doubt. See *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); Unified Appeal Procedure IV (B) (2) (providing that, in all death penalty cases, this Court will determine whether the verdicts are supported by the evidence).

2. The trial court charged the jury regarding self-defense, justification, accident, voluntary manslaughter, and defense of habitation under OCGA § 16-3-23 (1).[3] Nevertheless, Barrett contends that the trial court committed harmful error in failing to charge on defense of habitation under OCGA § 16-3-23 (2), despite Barrett's failure to request this charge. Barrett argues that this issue was preserved for appeal, as permitted under the law in effect at the time of his trial in 2005, because defense counsel reserved objections when asked by the trial court if he had any objections to the charge. See *Rivers v. State,* 250 Ga. 303, 309 (7) (298 SE2d 1) (1982). Compare OCGA § 17-8-58

---

[2] A deputy sheriff at the crime scene made an audiotaped recording of Barrett's spontaneous statements which he made while outside the residence after his removal from the home. The recording also contains statements made by Ms. Barrett. At oral argument, Barrett's counsel urged this Court to review the recording, contending that the statements contained therein support Barrett's testimony and discredit Ms. Barrett's testimony. Because the recording was admitted into evidence and played before the jury, we have reviewed it as part of our review of the complete record. See OCGA § 17-10-35. We note that portions of the recording are unintelligible and that much of what is discernable from Barrett's statements is either ambiguous or could be perceived as self-serving. Moreover, "[t]his Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." (Citation omitted.) *Dean v. State,* 273 Ga. 806, 807 (1) (546 SE2d 499) (2001).

[3] While both parties indicated in their briefs to this Court that the trial court also charged the jury on involuntary manslaughter, a review of the trial transcript shows that the trial court refused defense counsel's request to so instruct the jury.

(providing, as amended, that the failure to contemporaneously object to jury instructions precludes appellate review of the charge except in cases of plain error); Ga. L. 2007, pp. 595-597, §§ 1, 5, eff. July 1, 2007. Assuming, but not deciding, that such a charge was authorized,[4] a criminal defendant is ordinarily required to present written requests for any desired instructions. See OCGA § 5-5-24 (b). While the law at the time of Barrett's trial may have

> relieve[d] a criminal defendant from the requirements of preserving errors in the charge imposed in civil cases, . . . "this d[id] not relieve him from the necessity of requesting instructions, or making timely objection in the trial court on the failure to give instructions, except in those circumstances where the omission is clearly harmful and erroneous as a matter of law in that it fails to provide the jury with the proper guidelines for determining guilt or innocence."

(Citation omitted.) *Johnson v. State*, 253 Ga. 37, 38 (315 SE2d 871) (1984). As defense of habitation under OCGA § 16-3-23 (2) was not Barrett's sole defense, the omission of the unrequested charge was not clearly harmful as a matter of law. See *James v. State*, 275 Ga. 387, 389 (6) (565 SE2d 802) (2002). Accordingly, the trial court did not err in denying Barrett relief on this claim.

3. Barrett claims that, in denying the motion for new trial, the trial court erred by not finding that his trial counsel failed to provide effective assistance of counsel in several respects. In order to prevail on an ineffective assistance of counsel claim, a defendant must show both that counsel rendered deficient performance and that the deficient performance prejudiced his defense. See *Smith v. Francis*, 253

---

[4] It is undisputed that Youngblood was a guest in Barrett's home at the time that the altercation began. Under Georgia law, "defense of habitation is not a defense available to a defendant when the victim is a guest in the home," even in cases where the guest-victim is unruly or even threatening. *Stobbart v. State*, 272 Ga. 608, 612 (4) (533 SE2d 379) (2000) (holding that the habitation defense was not available where a guest-victim prevented the resident-defendant and his girlfriend from leaving the defendant's apartment, threatened the defendant that he would " 'get what's coming to [him,]' " and placed his hand on his pistol). Nor does the habitation defense become available by virtue of the resident-defendant's directing the guest-victim to leave the residence and the guest-victim's refusing to do so. See *Stephens v. State*, 71 Ga. App. 417, 421, 422-423 (2) (31 SE2d 217) (1944) (holding that the habitation defense was not available where the resident-defendant directed the guest-victim to leave because of his unruly behavior before the guest-victim came at the defendant with a knife). This is so because the statute is concerned with " 'homicides having their *origin* in a forcible attack and invasion of the property or habitation of another[.]' " (Citation omitted; emphasis supplied.) Id. See also *Stobbart*, 272 Ga. at 612 (4). We express no opinion as to what, if any, effect the fact that Barrett "had finally thrown [Youngblood] out" of the residence had on the issue of whether he was entitled to a defense of habitation charge, as that issue is not before us.

Ga. 782, 783 (1) (325 SE2d 362) (1985) (citing *Strickland v. Washington*, 466 U. S. 668, 687 (104 SC 2052, 80 LE2d 674) (1984)). To meet the first prong of the test, a defendant must overcome the strong presumption that counsel's performance fell within a "wide range of reasonable professional conduct" and that counsel's decisions were "made in the exercise of reasonable professional judgment." Id. To meet the test's second prong, a defendant is required to show that there is a reasonable probability that, absent counsel's unprofessional errors, the result of his trial would have been different. See id. An ineffective assistance of counsel claim is a mixed question of law and fact; we accept the trial court's factual findings unless clearly erroneous, but we independently apply the legal principles to the facts. See *Turpin v. Lipham*, 270 Ga. 208, 211 (3) (510 SE2d 32) (1998).

*(a) Barrett's Trial Counsel.* Approximately one month after Barrett's arrest, the trial court appointed local attorney Fletcher Griffin to represent him. After the State filed notice of its intent to seek the death penalty, the trial court appointed Michael Mears of the Multi-County Public Defender's Office to act as lead counsel and directed that Griffin serve as co-counsel. Griffin was allowed to withdraw due to a conflict of interest, and William Oliver was appointed to replace him. Mears served as Barrett's lead counsel for approximately one year. At a hearing in December of 2003, Barrett requested that he be allowed to serve as co-counsel for his defense, stating to the trial court that he "consider[ed] [him]self one of the best jailhouse lawyers" in the county and that he and his trial counsel had an "issue with strategy." The trial court denied Barrett's request. See *Hance v. Kemp*, 258 Ga. 649, 650 (1) (373 SE2d 184) (1988) (holding that a defendant does not have the right to act as co-counsel). When, with the aid of family and friends, Barrett retained Lee Parks to represent him, the trial court permitted Mears and Oliver to withdraw from Barrett's case and eventually appointed Parks's law partner, Greg Valpey, to assist Parks.[5] By the time of Parks's entry of appearance, Mears and his defense team had completed a great deal of investigation and preparation of the case. This included filing and litigating over 100 motions and retaining several experts and an investigator to locate and interview potential witnesses. Parks testified at the hearing on the motion for new trial that it was for that reason that he agreed to accept an extremely reduced fee to represent Barrett.

---

[5] The trial court noted in its order appointing Valpey as co-counsel that it "had previously observed that [Barrett] and [Mears] were not in agreement regarding the defense of this case and it was unlikely that an attorney-client relationship would be maintained between [Barrett] and the State agency responsible for death penalty representation."

Both Parks and Valpey had been practicing criminal law for approximately twenty years. Parks had spent approximately ten years as an assistant district attorney before forming his own criminal defense firm. At the time of representing Barrett, Parks had been involved in eleven death penalty cases, ten as a prosecutor and one as defense counsel. Valpey had served as defense co-counsel in one death penalty case that went through trial. Despite trial counsel's experience, Barrett alleges that they made several errors and omissions in their representation of him. Thus, it is appropriate to look first at trial counsel's actions. See *Franks v. State*, 278 Ga. 246, 250 (2) (A) (599 SE2d 134) (2004); *Grayson v. Thompson*, 257 F3d 1194, 1219 (11th Cir. 2001).

*(b) Investigation and Presentation at Trial.* After Parks entered Barrett's case in February of 2004, Mears provided him with his file and the information that he had obtained through his investigation, which Mears and his defense team reviewed "very extensively" with Parks. Parks testified that he saw everything in Mears's file and that he reviewed the discovery provided by the State. Barrett's trial was scheduled to begin in July of 2004. However, after Parks and Valpey conducted voir dire and approximately one-third of the otherwise qualified jurors were excused due to prejudice, bias, or fixed opinions as a result of their knowledge of the case or the parties, the trial court granted defense counsel's motion for a change of venue and accepted their proposal that the case be transferred to Hall County for purposes of venue.[6] See *Tyree v. State*, 262 Ga. 395, 397 (1) (418 SE2d 16) (1992).

Trial counsel's defense strategy was to show that Barrett and Youngblood were "lifelong" friends who spent the evening of August 3, 2002, drinking beer together after Youngblood came to Barrett's home "agitated," "angry," and already injured as a result of having engaged in an earlier altercation, that Youngblood had a propensity for violence when he became intoxicated, and that Youngblood was the aggressor on the morning of the shooting. When the report of the Georgia Bureau of Investigation (GBI) Crime Lab indicated that the results of Youngblood's blood test for alcohol might not be reliable, defense counsel agreed to enter into a stipulation with the State at trial that Youngblood's blood alcohol level was 0.242 grams per 100 milliliters and that a blood alcohol level of 0.08 grams per 100 milliliters constitutes a presumption that a person is under the influence of alcohol to the extent that it would be less safe to drive.

---

[6] Mears placed on the record that Barrett "[wa]s very insistent, and rightly so, that he want[ed] the case changed to another venue."

The first defense witness was Deborah Fortenberry, who testified that she had known Barrett and Youngblood since they were teenagers, that she was present at the South Side Bar in Helen when Barrett and Youngblood came in on the evening of August 3, 2002, that they stayed until the bar closed at midnight, that the two were their usual friendly selves toward each other even though Youngblood "was not as happy as he usually [wa]s," and that Youngblood may have had a "mark" in his lip area, thereby corroborating Barrett's testimony that followed. Barrett's testimony established a prima facie case of justification, see Division 1, and allowed the defense to present evidence of prior violent acts by Youngblood against third parties. See *Harrison v. State*, 268 Ga. 574, 577 (3) (492 SE2d 218) (1997) (explaining the threshold showing required before evidence of a victim's prior violence is admissible).[7]

The defense presented two witnesses to testify regarding the victim's prior violent acts. Youngblood's ex-wife testified that she had a cast on her left arm and was driving with an intoxicated Youngblood and her two young children in the car when Youngblood forced her to pull over by grabbing her right arm, "put his fist through the windshield," yanked the keys from the ignition, and grabbed her arm, twisted it behind the seat, and threatened to break it. His former roommate testified that an intoxicated Youngblood struck her without warning, causing her to "hit the wall" and "f[a]ll over on the couch"; that he "jumped over [her] shoulders," "pinned [her] down," "beat [her] up," "[t]ried to rip [her] teeth out," and "beat [her] until he passed out nearly from exhaustion"; and that she suffered a concussion and other injuries requiring medical treatment. Both witnesses testified that they were familiar with Youngblood's reputation in the community and that he had a reputation for violence, and his former roommate also opined that alcohol consumption was "the main trigger" for Youngblood's violence. The State introduced certified copies of accusations charging Youngblood with two counts of battery arising out of these incidents and his guilty pleas to these charges.

Based on testimony elicited by his cross-examination of the State's witnesses, Parks attacked the investigation of the case during closing argument by contending that law enforcement failed to promptly secure and adequately process the crime scene, to canvas the neighborhood, and to make an audio recording of their interviews with Ms. Barrett and Barrett. Parks also attacked the reliability of Ms. Barrett's and the medical examiner's testimony, which is more

---

[7] Effective January 1, 2013, the admission of such evidence is governed by OCGA §§ 24-4-404 and 24-4-405.

thoroughly discussed below, and he reminded the jury of Youngblood's prior violent acts, his two guilty pleas to battery, his reputation for violence when intoxicated, and his high level of intoxication at the time of his death. After also reminding the jury of Youngblood's bad behavior and Barrett's perception that he was "trying to get a large rock," Parks then argued that, regardless of whether the rock "really was there or not," it was Barrett's perception and the reasonableness of that perception under the circumstances that mattered. Parks described the shooting as occurring when Youngblood "lunge[d]" at Barrett, Barrett "[went] back, [and] the gun [went] off," and trial counsel sought and obtained jury instructions on self-defense, accident, voluntary manslaughter, and defense of habitation. Nonetheless, the jury returned guilty verdicts on all counts.

At the sentencing phase, the State presented as evidence in aggravation the testimony of six witnesses, including Barrett's sister and brother-in-law. Their testimony showed the following: Barrett was present at a fight in the early 1980s and, when an individual intervened, Barrett pointed a pistol at him and said, "Let them fight"; Ms. Barrett took out a warrant for Barrett's arrest in May of 2002 after Barrett knocked her to the ground and kicked her, but she later signed "a letter" that Barrett helped her write denying that he hurt her and stating that she did not wish to prosecute; while incarcerated awaiting trial, Barrett and a fellow inmate carried out Barrett's idea to burn a hole in the inmate's cell window to receive cigarettes, and Barrett also sought to have someone smuggle in "hacksaw blades"; a Hall County deputy overheard Barrett say that the deputies "wouldn't have any trouble out of him unless he was found guilty"; and Barrett made what family members perceived to be a serious threat to kill his sister because he was angry about the possible distribution of certain items in his mother's estate.

On cross-examination of these witnesses, trial counsel elicited the following testimony: the individual at the fight also pulled a gun on Barrett, Barrett was not involved in the fight, and the police, who were called to the fight, looked for but never found a gun in Barrett's possession; the "letter" that Ms. Barrett referred to was actually her sworn affidavit that had been prepared by an attorney, and the grand jury had returned a no bill for the charge arising out of the incident; the inmate agreed to testify against Barrett as part of a plea agreement involving not one but two criminal cases against him, he never saw anything pushed through the hole in his window from the outside, his contraband lighter was used in creating the hole, and he had convictions for possession of methamphetamine with the intent to distribute and for criminal interference with government property;

it had been several days since the deputy overheard Barrett's statement, which he obviously had not acted on; and Barrett also did not act on his threat to his sister or even confront her directly with it, the estate had been settled, his sister had had subsequent conversations with Barrett, and she loved him. In addition to effectively cross-examining the State's witnesses, trial counsel prevented the State's introduction of additional evidence in aggravation, including almost 20 prior incidents by Barrett and evidence that a razor blade was discovered in his mattress while he was incarcerated awaiting trial.

Trial counsel presented the testimony of two mitigation witnesses. Davis Sutton testified that he first became acquainted with Barrett when he watched Barrett play high school basketball, that they became close friends when Sutton returned from his military service in Vietnam, and that Barrett was "one of the few people" that recognized him for his service. Sutton also testified that he "stayed drunk, on drugs, or both" for 15 years after his return and that, after repeatedly going through a drug treatment program, he had stayed "clean and sober" for 12 years. He mentioned that Barrett had attended college, and he testified that "[Barrett] was and is my friend," explaining that Barrett helped him through his addiction by giving him money, food, and a place to stay and that after he "went straight" he had remained friends with Barrett, who considered Sutton his role model. Sutton also testified that he had earned a degree in social work that he utilized to counsel on a volunteer basis at the local mental health facility; that he, Barrett, and Youngbood, who was his cousin, had all been friends; and that he had counseled Youngblood as a friend. Sutton described how, upon his arrival at Barrett's home on the morning of the shooting, he saw an "extremely distraught" and tearful Barrett put a .357 revolver to his head and cock it, how he was convinced that Barrett intended to pull the trigger, and how he persuaded Barrett that was not the answer. Sutton concluded by describing Barrett as a good listener and an "openhearted, benevolent, intelligent, helpful kind of person" who "would make an excellent counselor," and he stated that "there is much more good in Clay Barrett than there is evil." He told the jury:

> [Barrett] has a lot to offer. . . . [T]he potential is there and if he chooses to use it, he could still be very beneficial to a lot of people, possibly even to the point of . . . let[ting] someone else make the choice not to make the same mistakes he has made in his life.

Sutton's testimony supported trial counsel's mitigation theory of showing Barrett's good character, remorse, and possibilities for redemption.

Fortenberry testified that she had known both Barrett and Youngblood for over 20 years, that she had a good relationship with both of them, and that Barrett and Youngblood had a "[v]ery good" relationship with each other based on an "unconditional" love that caused them to put each other before themselves. As she explained, "You couldn't like one without liking the other," because "[t]hey just wouldn't have it." She also testified that both men were "polite" and "protective" of those who could not protect themselves. She cited as an example the fact that Barrett and Youngblood were her only friends that tried to protect her from an abusive spouse. She described Barrett as "helpful" and "never rude," and she testified that he was worth saving, as he was "extremely good people." She indicated that, if Youngblood had been the defendant and Barrett the victim, she would be testifying "[t]he same way." Fortenberry's testimony affirmed trial counsel's guilt/innocence phase defense that Barrett and Youngblood were good friends and that Barrett would not have shot his friend except in a case of accident or justification. Thus, it supported trial counsel's residual doubt theory as to how the shooting occurred. Her testimony also supported trial counsel's mitigation theory of showing Barrett's good character.

At closing, Valpey argued residual doubt, contended that Barrett did not present concerns that he would murder again as he was so remorseful over having shot his friend that he wanted to end his own life, and maintained that Barrett was capable of "aton[ing] and mak[ing] amends" if presented with an opportunity for redemption. Valpey explained that the defense was not offering an explanation such as "a troubled childhood" for Youngblood's killing, because Barrett was "a 49-year-old man"; instead, he reminded the jury that Barrett had been a high school athlete, that he had a child,[8] and that Sutton had testified "that he has tons more good than bad." After discounting the State's non-statutory aggravating evidence, he reminded the jury that the last thing that Barrett's sister had said was, "I love my brother," and that Barrett's friends had testified that he "would go to great lengths to help others." Finally, he argued that a life sentence with the possibility of parole was appropriate and that, as Sutton had suggested, perhaps Barrett could help others avoid mistakes like

---

[8] During Parks's cross-examination of one of the State's similar transaction witnesses at the guilt/innocence phase, he elicited testimony that Barrett's son had lived with him.

those that he had made. The jury deliberated between three and four hours before returning a verdict recommending a death sentence.

*(c) Ineffective Assistance of Counsel at the Guilt/Innocence Phase.* Barrett alleges that trial counsel rendered ineffective assistance at the guilt/innocence phase in various ways.

*(1) Failure to develop and present evidence of the victim's methamphetamine use.* Barrett alleges that trial counsel were ineffective by failing to develop and present evidence of Youngblood's methamphetamine use at the time of the crimes to explain his irrational and volatile behavior. "Evidence of drug use is inadmissible when it is intended only to impugn a victim's character and has no relevance to any disputed issues in the case." *Crowe v. State*, 277 Ga. 513, 514 (591 SE2d 829) (2004). See OCGA § 24-2-2. In order for evidence of Youngblood's methamphetamine use to have been admissible at trial, Barrett was required to show how the use of the drug contributed to Youngblood's behavior so as to make it relevant to his justification defense. See *James v. State*, 270 Ga. 675, 676 (2) (513 SE2d 207) (1999).

At the hearing on the motion for new trial, Barrett introduced testimony that Youngblood had used the drug on several occasions, the occasion nearest in time to the incident being two to three days before the date of the crimes. However, "[he] was unable to show in his [hearing on the motion for new trial] that [Youngblood] had been using [methamphetamine] at a time close enough to the shooting to have had an influence on him at the time of the shooting." *James*, 270 Ga. at 676 (2). Accordingly, evidence of methamphetamine use was not relevant and thus would have been inadmissible at Barrett's trial. See id. (finding that evidence that the victim was "a regular [marijuana] user" was irrelevant to the defendant's justification defense and properly excluded, where the defense could not demonstrate that the victim smoked marijuana on the day of his death). Because the testimony Barrett contends should have been presented about Youngblood's alleged methamphetamine use was irrelevant and inadmissible, trial counsel did not act deficiently by failing to locate and produce witnesses to present that testimony at trial. See *Smart v. State*, 277 Ga. 111, 113 (5) (587 SE2d 6) (2003) (finding that trial counsel was not deficient for failing to discover and produce irrelevant and inadmissible evidence). Barrett's related argument that trial counsel were deficient in failing to introduce expert testimony connecting Barrett's alleged methamphetamine use to his behavior also fails in the absence of any evidence that Youngblood was actually under the influence of methamphetamine at the time that Barrett shot him. See *James*, 270 Ga. at 676 (2); *Carter v. State*, 303 Ga. App. 142, 148 (3) (692 SE2d 753) (2010).

Barrett also claims that trial counsel were ineffective in failing to request that the Crime Lab test Youngblood's blood and urine for the presence of methamphetamine. In support of this claim, Barrett presented the testimony of a pharmacologist who testified that the Crime Lab had the capability of testing for the presence of methamphetamine in blood and urine at the time of Barrett's trial. However, Barrett failed to present any evidence establishing that the presence of methamphetamine in Youngblood's blood or urine would have established that he was under the influence of the drug at the time of the shooting. See *James*, 270 Ga. at 676 (2) (finding that evidence of marijuana use found in the victim's blood was irrelevant where it did not conclusively show the victim's use within a few hours before death, and there was no evidence that the victim was actually under the influence of marijuana at the time the defendant shot him). Furthermore, while the pharmacologist indicated that Youngblood's behavior immediately before the shooting as deduced from his review of Barrett's trial testimony was consistent with the combined use of alcohol and methamphetamine, he acknowledged that Youngblood's behavior could also be consistent with the use of alcohol alone. Moreover, he could only speculate as to what, if any, effect methamphetamine would have had on Youngblood at the time of his fatal confrontation with Barrett. Accordingly, Barrett failed to show that, even had evidence of methamphetamine use been found in Youngblood's blood or urine, such evidence would have been relevant and thus admissible at trial. See *Bell v. State*, 280 Ga. 562, 565-566 (4) (629 SE2d 213) (2006); *Robinson v. State*, 272 Ga. 131, 133 (3) (527 SE2d 845) (2000). As Barrett failed to show that any such evidence would have benefitted the defense, he cannot show that trial counsel were deficient or that he was prejudiced by trial counsel's not obtaining such evidence.

*(2) Conflict of interest claim.* In a related claim, Barrett contends that, in denying his motion for new trial, the trial court erred by finding that his trial counsel were not ineffective based on a conflict of interest on the part of trial counsel. To establish ineffective assistance of counsel due to a conflict of interest, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." (Footnote omitted.) *Cuyler v. Sullivan*, 446 U. S. 335, 348 (100 SC 1708, 64 LE2d 333) (1980). Accord *State v. Mamedov*, 288 Ga. 858, 860 (708 SE2d 279) (2011). Whether a conflict of interest denied a defendant his right to effective counsel "is a mixed question of law and fact, and we review the questions of law involved de novo." (Citations omitted.) *Davis v. Turpin*, 273 Ga. 244, 246 (3) (a) (539 SE2d 129) (2000).

At the hearing on the motion for new trial, Barrett presented the testimony of Patonia Nations, who testified that, while incarcerated with Barrett, she told him the following: her uncle brought Youngblood to her home on either August 1 or 2, 2002, where she sold Youngblood three and a half grams of methamphetamine; the three of them "did a line out of the bag," and Youngblood cornered her afterwards and tried to kiss her; she had to shove him a couple of times to get him off her; and Youngblood left with her uncle when he came into the room. Nations testified that at the time of Barrett's trial she was also represented by Parks in various criminal cases against her and that Parks told her in an interview concerning this incident that she could assert her Fifth Amendment right not to testify. Barrett contends that Nations's testimony would have supported his defense at trial based on Youngblood's irrational and volatile behavior and that Parks's failure to call Nations as a witness was the result of an actual conflict of interest that adversely affected his performance. The trial court denied Barrett's claim, finding that Parks gave several strategic reasons why he did not call Nations as a witness and, thus, Barrett did not meet his burden of showing that the alleged conflict of interest adversely affected Parks's decision not to call her to testify. See *Cuyler*, 446 U. S. at 348. After an independent review of the record, we agree that any alleged conflict of interest did not adversely affect Parks's performance.

The most that Nations's testimony showed was that Youngblood purchased and used methamphetamine two to three days before his death. As discussed in subdivision (1) above, this evidence does not show that Youngblood was actually under the influence of methamphetamine at the time of his death. Therefore, even if Parks had called Nations as a witness, her testimony would have been irrelevant and, thus, inadmissible. See *James*, 270 Ga. at 676 (2). Accordingly, Barrett has failed to establish that Parks's decision not to call Nations to testify was anything but a reasonable strategic decision or that Parks would have acted differently absent the alleged conflict of interest. See *Reid v. State*, 286 Ga. 484, 486 (3) (a) (690 SE2d 177) (2010) (stating that the determination of which witnesses to call is a strategic decision). The trial court did not err in concluding that Barrett was not entitled to a new trial based on trial counsel's conflict of interest.

*(3) Failure to present the testimony of Youngblood's girlfriend.* Barrett contends that trial counsel were ineffective in failing to interview and present the testimony of Linda Janet Bettis Maney, Youngblood's girlfriend who was present at Youngblood's altercation with his cousin. Barrett claims that Maney could have corroborated his testimony that Youngblood told him that he had recently been in

a fight with his cousin and could have described Youngblood's resulting agitation and injuries. Maney testified at the hearing on the motion for new trial that she was contacted by someone from trial counsel's office before Barrett's trial and that she told the individual that she did not think that what she had to say would help Barrett. The record also shows that trial counsel hired an investigator to locate Maney and Youngblood's cousin with whom he allegedly had the altercation but that the investigator's efforts were unsuccessful. Barrett has failed to show that trial counsel did not perform reasonably in their attempts to further pursue an investigation of Maney or other possible evidence to corroborate Barrett's testimony. Moreover, Maney's testimony confirms that she was correct in her assessment that her testimony would not have been helpful to Barrett. Maney explicitly testified that there was no fight between Youngblood and his cousin, that they only engaged in a "scuffle," that no punches were thrown, and that Youngblood's cousin never hit Youngblood. Furthermore, trial counsel presented Fortenberry's testimony to corroborate Barrett's testimony that Youngblood was in a sullen mood and had injuries on the evening prior to the shooting. Accordingly, Barrett also cannot show that he was prejudiced by trial counsel's alleged deficiencies concerning Maney.

*(4) Failure to obtain and develop impeachment evidence.* Ms. Barrett's trial testimony included several details inculpating Barrett that were not contained in the statement that she made to law enforcement officers on the morning of the incident. At the hearing on the motion for new trial, Barrett presented the deposition testimony of Sutton, who testified that Ms. Barrett told him that the district attorney threatened her with prosecution if she did not testify concerning "things outside of what she knew." Although trial counsel interviewed Sutton prior to trial, they did not elicit this information from him. Barrett contends that trial counsel were ineffective for failing to do so, as it could have been used to impeach Ms. Barrett. The trial court denied this claim, finding that "the failure of trial counsel to investigate Sutton's knowledge of impeaching facts is only apparent in hindsight." We agree. See *Davis v. State*, 290 Ga. 584, 587 (2) (b) (723 SE2d 431) (2012) ("[E]ffectiveness is not judged by hindsight. . . ." (Citation omitted.)).

Barrett contends that trial counsel were ineffective for not anticipating that Ms. Barrett's trial testimony, unlike her statement, would inculpate Barrett, because they were aware that Ms. Barrett had made threats to Barrett's first lawyer, Fletcher Griffin, that, if Barrett did not sign over an insurance check to her, she would be an "unfriendly" witness at trial. However, this claim is not supported by the evidence. At the hearing on the motion for new trial, Griffin

explicitly testified that Ms. Barrett never stated that she might change her testimony if Barrett did not sign the check over to her. Although he did state that he had "the feeling" that, if Barrett "didn't do what [Ms. Barrett] wanted him to do, that that would change her testimony," trial counsel are not deficient for failing to decipher and act on something as speculative as a former counsel's "feeling." See *Banta v. State*, 282 Ga. 392, 399 (6) (e) (651 SE2d 21) (2007) ("Mere speculation will not support a claim of ineffective assistance of counsel."). Moreover, Parks testified at the hearing on the motion for new trial that the defense chose not to question Ms. Barrett about the insurance check at trial, because Barrett had "satisfied her about the check so that bringing it up . . . would not be beneficial to [Barrett] and could cause the jury to think that . . . , since he had done that and she was testifying the way she was, . . . there may even be more there than what they're hearing." The decision not to cross-examine Ms. Barrett about the insurance check was a reasonable one. Furthermore, because Barrett had satisfied Ms. Barrett about the check, there was no reason for Parks to anticipate that Ms. Barrett would change her testimony based upon Barrett's refusal to cooperate with her. Moreover, there is no evidence that trial counsel did not consider that Ms. Barrett's testimony at trial might change, as a review of the record shows that they were prepared to thoroughly cross-examine her on the inconsistencies between her testimony and her statement to law enforcement. However, Barrett has failed to show that trial counsel had any reason to believe that Ms. Barrett would indicate to *Sutton*, who Ms. Barrett testified was Barrett's "long-life buddy," that at trial she intended to implicate Barrett. Barrett also has provided no evidence other than Sutton's hearsay testimony that the prosecution threatened Ms. Barrett into changing her testimony. Although the district attorney testified at the hearing on the motion for new trial on another matter, Barrett did not question him on this issue, and Ms. Barrett did not testify. All things considered, Barrett has failed to show that trial counsel were deficient.

Nor has Barrett shown that he was prejudiced. During her testimony, the jury heard that Ms. Barrett had filed for a divorce from Barrett, that the divorce would become final in two weeks, and that the marriage had been tumultuous and had lasted only a year. Trial counsel questioned Ms. Barrett on cross-examination regarding the significant portions of her testimony that she had omitted in her statement to police and at closing reminded the jury of the alleged inconsistencies and argued that her testimony was unreliable. Accordingly, Barrett failed to show that had counsel additionally impeached Ms. Barrett with Sutton's deposition testimony, there is a reasonable

probability that the result of the trial would have been different. See *Kendrick v. State*, 287 Ga. 676, 680 (4) (699 SE2d 302) (2010).

*(5) Failure to request that the jury be instructed pursuant to OCGA § 16-3-23 (2).* As discussed in Division 2 above, trial counsel requested and were granted a jury instruction on defense of habitation under OCGA § 16-3-23 (1); however, no jury instruction on defense of habitation under OCGA § 16-3-23 (2) was requested, and none was given. Subsection (1) authorizes the use of deadly force to prevent or terminate an unlawful entry into or an attack upon a habitation if the "entry is made or attempted in a violent and tumultuous manner" and the defendant has a reasonable belief that the entry is made "for the purpose of assaulting or offering personal violence to any person" therein. Approximately four years before Barrett's trial, the General Assembly amended OCGA § 16-3-23 by inserting a new subsection (2) and re-labeling the previous subsection (2) as subsection (3). See Ga. L. 2001, p. 1247, § 2. The current subsection (2) authorizes the use of deadly force against a person who is a nonmember of the family or household if that person "unlawfully and forcibly enters . . . the residence and the person using such force knew or had reason to believe that an unlawful and forcible entry occurred." Barrett contends that he testified at trial that, at the time of the shooting, he was standing over Youngblood in an attempt to block his re-entry into Barrett's residence when Youngblood lunged at him. Thus, he claims that, if the jurors had received a defense of habitation charge under subsection (2), there is a reasonable probability that they would have determined that he was entitled to use deadly force to defend against "an unlawful and forcible entry" even without finding that he was in reasonable fear of his life.[9]

Parks testified at the hearing on the motion for new trial that he "was sure that he was vaguely aware" at the time of Barrett's trial that the defense of habitation statute had been amended in 2001 to add subsection (2), but he stated that he relied on the pattern charge book to obtain the language for his requests to charge and did not further research the defense of habitation defense.[10] We need not

---

[9] Barrett also contends that the alleged harm caused by the omission of an instruction pursuant to subsection (2) was exacerbated by the fact that the prosecutor in his closing argument "misled" the jury on the duty to retreat. See OCGA § 16-3-23.1 (providing that a person who uses force in accordance with Code Section 16-3-23 has no duty to retreat). However, the trial court charged the jury on the lack of a duty to retreat. Therefore, assuming without deciding that the prosecutor's remarks when viewed in context raised the issue of retreat, the jury would not have been misled. See *Johnson v. State*, 253 Ga. 37, 38-39 (315 SE2d 871) (1984).

[10] While the trial court found that "counsel was relying on a book of jury charges that was almost five years old," Parks testified that he obtained the charge from "the most recent pattern charge book," and the charge's citation is to the Third Edition of the Suggested Pattern Jury

decide whether Parks's performance here was deficient, because, assuming that Barrett was entitled to a charge on defense of habitation in the first place,[11] we conclude that he has failed to show how he was prejudiced by the failure to request a charge under subsection (2). See *Lajara v. State*, 263 Ga. 438, 440 (3) (435 SE2d 600) (1993).

While Barrett argues that his case is analogous to that of *Benham v. State*, 277 Ga. 516 (591 SE2d 824) (2004), in which this Court found trial counsel ineffective for failing to request a defense of habitation charge, *Benham* is distinguishable on its facts. In that case, it was undisputed that the victim struck the first blow by attacking the defendant through the window while she sat *inside* her automobile, see OCGA § 16-3-24.1 (providing that a motor vehicle is a habitation under OCGA § 16-3-23), and that someone tried to pull the victim away from the automobile at least twice but the victim resisted. See id. at 517. Here, however, it was undisputed at trial that Barrett and Youngblood were several feet *outside* the residence at the time of the shooting, and, contrary to Barrett's contention, Barrett did not testify that Youngblood was attempting to re-enter or attack the residence *when the shooting occurred.* See *Coleman v. State*, 286 Ga. 291, 298 (6) (687 SE2d 427) (2009) ("Critical to the application of the defense of habitation is the moment in time at which the defendant resorts to deadly force and the act being performed by the victim at that moment."). Instead, according to Barrett's own testimony, the shooting occurred in the following manner. Barrett had Youngblood out of the house "to stay" when he went back inside the residence and sat down, but, after seeing Youngblood drag what he perceived to be a rock with his foot, he came out of the house and kicked Youngblood from one side of the porch to the other. As a result, Youngblood was lying on the ground several feet outside the residence, and Barrett testified that "[he] would have went in the apartment and locked the door . . . had [he] not sent [Ms. Barrett] to go call [the police]." He explained that he could not leave Youngblood "out there," because he

---

Instructions, which was published in 2003. See Suggested Pattern Jury Instructions: Vol. II, Criminal Cases § 3.03.10 (3d ed. 2003). Even if Parks obtained his request to charge from the most recent update to the Third Edition that was available at the time of Barrett's trial, that version still contained the same defense of habitation charge as Parks submitted. See Suggested Pattern Jury Instructions: Vol. II, Criminal Cases § 3.03.10 (3d ed., Jan. 2005 update). Moreover, we note that the pattern defense of habitation charge in the *most recent* edition of the Suggested Pattern Jury Instructions remains substantially verbatim the same charge that appeared in the Third Edition. Most significantly, it does not contain a charge under subsection (2). See Suggested Pattern Jury Instructions: Vol. II, Criminal Cases § 3.12.10 (4th ed., July 2012 update). Nor does it alert counsel by way of a notation that one of the ways that a defendant may be justified in the use of deadly force in defense of habitation is not included in the suggested charge and may be found at OCGA § 16-3-23 (2).

[11] See Division 2, n. 4 above.

was a threat to Ms. Barrett, whom he expected to return at any time. While Barrett was holding the gun pointed at Youngblood, Youngblood lunged at him from his position on the ground. Barrett shot and killed Youngblood in response, which was consistent with Barrett's self-defense argument.

By rejecting Barrett's argument that he shot Youngblood in self-defense, the jury necessarily found that Barrett was not justified in using deadly force, because he could not have reasonably believed that such force was necessary to prevent death or great bodily injury to himself or a third person. By the time of the shooting, Youngblood had suffered over 40 injuries, including multiple severe lacerations to his head, a severe gouging to his eye, and a kick forceful enough to move him from one side of the porch to the other, and Barrett acknowledged that he knew that Youngblood was not armed. Given these facts, Barrett's own testimony, and the jury's rejection of Barrett's self-defense defense, there is no reasonable probability that the jurors would have considered Youngblood to be sufficiently threatening that, at the time of the shooting, Barrett could have reasonably believed that deadly force was necessary to prevent Youngblood from unlawfully and forcibly entering Barrett's residence. See *Fair v. State*, 288 Ga. 244, 257 (2) (A) (3) (702 SE2d 420) (2010) ("The statute's introductory clause defines when an actor is justified in the use of *any* force or threats of force in the defense of habitation, namely, 'to the extent that he reasonably believes that such threat or force is necessary to prevent or terminate such other's unlawful entry into or attack upon a habitation.' "). Accordingly, even assuming that a defense of habitation charge under subsection (2) had been requested, authorized, and given, there is no reasonable probability that the jury would have determined that Barrett was entitled to and did use deadly force against Youngblood because he was defending against Youngblood's unlawful and forcible entry of his habitation. See *Springs v. Seese*, 274 Ga. 659, 661 (3) (558 SE2d 710) (2002).

*(6) Failure to interview the medical examiner.* Barrett contends that trial counsel were ineffective with regard to the State's expert witness, Dr. Lora Darrisaw, the medical examiner who performed the autopsy on the victim. While Dr. Darrisaw conducted Youngblood's autopsy, the deputy chief medical examiner, Dr. Mark Koponen, supervised her and signed the autopsy report because her Georgia license was pending at the time.[12] At trial, Dr. Darrisaw testified that

---

[12] Barrett's contention that trial counsel were deficient for failing to object to Dr. Darrisaw's testimony on this basis is without merit. Although Parks testified at the hearing on the motion for new trial that he did not know at the time of trial that Dr. Darrisaw was not licensed

she determined that the wound to Youngblood's head behind his right ear was a contact entrance gunshot wound and that there was no exit wound. She also testified that a probe placed in the injury to the right eye showed that it was not a penetrating wound and, thus, could not be an entrance gunshot wound.

At the hearing on the motion for new trial, Barrett presented the testimony of Dr. Darrisaw, as well as his own medical expert, Dr. Kris Sperry. Both experts testified that it was possible that the muzzle of Barrett's .357 revolver contacted Youngblood's head behind his right ear when, as Barrett testified, he fired the gun as Youngblood lunged at him. Barrett now contends that trial counsel were ineffective in failing to interview Dr. Darrisaw and learn pre-trial that her opinion was not inconsistent with Barrett's account of the incident so that they could elicit this testimony at trial. The trial court found that trial counsel conducted a thorough investigation and that their actions were the result "of a strategic decision." While the court provided no analysis to show how it reached its conclusion, after an independent review of the record we agree that trial counsel thoroughly investigated the autopsy report and the victim's injuries, and we conclude that the approach that trial counsel took at trial with regard to Dr. Darrisaw was the result of a reasonable strategic decision. See *Martin v. Barrett*, 279 Ga. 593, 593 (619 SE2d 656) (2005) (" 'Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]' " (Citation omitted.)).

A review of the record shows that Mears was representing Barrett at the time that the autopsy report was turned over to the defense and that, at least initially, Mears was highly critical of Dr. Darrisaw's report. At a motions hearing in August of 2003, he expressed to the trial court his disagreement with Dr. Darrisaw's conclusions regarding the wounds to the back of Youngblood's head and right eye. Mears showed the trial court an autopsy photograph of Youngblood, pointing out to the court that "there[ wa]s a hole in the man's head between his eyeball and his nose." He stated repeatedly

---

in Georgia when she conducted Youngblood's autopsy, the trial transcript indicates otherwise, as one of Parks's first questions to her on cross-examination was what her status was at the time of performing Youngblood's autopsy. Dr. Darrisaw explained that her application for a Georgia license was still pending at the time of the report and that, "in the State of Georgia, as well as most states, if you are not licensed, you can't sign the report but you can certainly perform the autopsy." Barrett's own expert, Dr. Kris Sperry, the chief medical examiner for the State of Georgia, confirmed at the hearing on the motion for new trial that Dr. Darrisaw was correct and testified that Dr. Koponen was well-qualified to supervise Youngblood's autopsy and that Dr. Darrisaw was well-qualified to perform the duties she was asked to perform under Dr. Koponen's supervision.

that it was his opinion that the bullet entered at that location "and went . . . front to back and downward and exploded with massive force out the back of his head. . . ." Mears also asserted that the autopsy report was deficient in numerous other respects, and he asked the trial court to issue an order directing that the defense be given "full and complete access" to all bench notes, photographs, tape recordings, and any other material relating to the autopsy, that the trial court direct its order not only to the Crime Lab but also to Drs. Koponen and Darrisaw for their individual notes, and that the defense be provided with Drs. Koponen's and Darrisaw's credentials. The trial court granted Mears's request and directed him to prepare the order, which the record shows was entered. A review of ex parte proceedings also shows that Mears obtained funds to retain a pathologist to review the autopsy report, to go to the Crime Lab to meet with "the medical examiner who performed the autopsy[,] and to review the GBI's documents" and that the pathologist was retained and "completed his work." Thus, when Parks and Valpey took over Barrett's case, Mears and his team had already thoroughly investigated Dr. Darrisaw and the issues surrounding the autopsy.

Although Parks testified that he did not recall interviewing Dr. Darrisaw prior to trial and that he himself did not consult any experts, he also testified that he reviewed everything in Mears's file and that he researched the issues surrounding the autopsy by reading relevant books and papers. He also testified that he questioned some of the conclusions in Dr. Darrisaw's report but that the defense team was unable to locate an expert that could provide any contrary testimony. Moreover, Parks stated that he found nothing in what he read or what Mears and his staff related to him that supported Barrett's contention that he shot the victim in the face, and Dr. Sperry, Barrett's own expert, testified at the hearing on the motion for new trial that, without question, the injury behind Youngblood's right ear was a contact entrance gunshot wound, that there was no exit gunshot wound, and that the wound to the eye was not an entrance gunshot wound. However, it is also evident from the record that Barrett has consistently and adamantly maintained that he shot Youngblood in the right eye.[13] After Parks could find no medical

---

[13] At trial, the State introduced an exhibit that Barrett identified as a letter that he had written to an editor of a gun magazine "to see if he would investigate the shooting . . . to see if it was a frontal entrance wound . . . to the right eye, or if it [wa]s a rear entry wound, like Miss Darrisaw said." Barrett's sustained contention that he shot Youngblood in the face is perhaps best reflected by the fact that, as recently as October of 2010, he filed and argued his own "Motion to Exhume the Victim's Body Prepared by Defendant Personally," despite being represented by counsel, and that, in his motion, he alleged that the "necessary measure" of

evidence to support Barrett's belief, a review of the trial transcript shows that he chose to attack Dr. Darrisaw's credibility instead, which was a reasonable strategic decision. See *Smith v. State*, 283 Ga. 237, 240 (2) (d) (657 SE2d 523) (2008) (finding that trial counsel was not ineffective for deciding to attack the State expert's credibility).

At trial, Parks elicited testimony from Dr. Darrisaw that her Georgia license was still pending at the time of conducting Youngblood's autopsy and that his autopsy was among the first that she conducted after having completed a one-year fellowship in forensic pathology only five days earlier. Parks also elicited testimony from the GBI agent who analyzed the crime scene that it had been his opinion upon viewing Youngblood's body at the scene that the right eye injury was an entrance gunshot wound and that the bullet had exited the back of his head. When Barrett took the stand, he testified repeatedly that Youngblood was facing him when he fired the gun. He also vehemently denied jamming his finger or his hand into Youngblood's eye as Ms. Barrett had testified or that anything could have been responsible for the eye injury other than that it was an entrance gunshot wound.

The testimony that Parks elicited from Dr. Darrisaw enabled him to argue in closing that, when she "did this autopsy of Stumpy's body, she had been an assistant medical examiner for five days," that she "hadn't even been issued her license to practice in Georgia and had to be supervised," that "Stumpy's autopsy was one of the first autopsies she performed," and that the jurors "must consider her level of inexperience when considering what weight to give to her opinions." Then trial counsel argued that Barrett was facing Youngblood when he shot him, as Barrett had testified, and he discounted every basis that Dr. Darrisaw had provided for her opinion that the wound behind Youngblood's right ear was a contact entrance gunshot wound and that the wound to the right eye could not be an entrance gunshot wound. In sum, based on Barrett's testimony in which he adamantly insisted that he shot Youngblood in the face and that the severe injury to Youngblood's right eye was caused by the bullet's entry and not by the ramming of his fingers or his fist into the eye, trial counsel argued that the wound to the back of Youngblood's head was *not* a contact entrance gunshot wound but an exit wound, that the eye injury *was* an entrance gunshot wound, and that Dr. Darrisaw was mistaken in her opinions. Therefore, it would have been not only

---

exhuming Youngblood's body "will prove that the actual entrance of the bullet was indeed in the corner of the decedent's right eye." Barrett's motion-for-new-trial counsel told the trial court, "It has been Mr. Barrett's opinion and belief that is unshaken that when the weapon was fired, it hit the victim in the eye, and that's the basis for his motion."

contrary to Parks's trial strategy but nonsensical for him to elicit testimony from Dr. Darrisaw that her opinion that the wound was a contact entrance gunshot wound was not inconsistent with Barrett's version of events. Furthermore, had Parks acted as Barrett now contends that he should have, Parks would have necessarily had to concede that Dr. Darrisaw could be correct. To do so would have supported the State's contention that, when Barrett shot Youngblood, Youngblood could not possibly have been a substantial threat to Barrett because, in addition to his other injuries, his eye had already been severely wounded, causing him significant pain and affecting his vision. Particularly given the fact that, through viewing photographs admitted into evidence, the jury would see the same eye injury that, at least upon initial view, a GBI crime scene analyst and an experienced death penalty defense attorney had considered to be an entrance gunshot wound, trial counsel's strategy was not unreasonable. Thus, it cannot be the basis of a successful ineffective assistance of counsel claim. See *Thomas v. State*, 284 Ga. 647, 650 (3) (b) (670 SE2d 421) (2008).

Moreover, neither the State nor the defense asked Dr. Darrisaw whether the fact that the wound to the back of Youngblood's head was a contact entrance gunshot wound would tell her anything about the positions of the participants other than that the muzzle of the gun was in contact with the skin when the shot was fired. Nevertheless, she implied that she had no opinion as to the participants' positions at the time of the shooting, as she testified that the pathway of the bullet "did not tell her anything" about the participants' positions and that "[she] would have to know that." Further, in closing, the prosecutor argued:

> [B]ut still could it have been self-defense, even though the shot is to the back of the head? The defense really didn't argue this. Mr. Barrett didn't claim it. *But could it be possible [Youngblood] was coming at Mr. Barrett and at the last minute turned his head? Well, anything is possible.*

Thus, even assuming that trial counsel were deficient in failing to elicit testimony from Dr. Darrisaw that the head wound could have occurred as Youngblood lunged at Barrett, given her implication that she could not opine on the participants' positions at the time of the shooting and the State's concession that such a scenario was possible, Barrett cannot establish prejudice.

*(d) Ineffective assistance at the sentencing phase.* Barrett contends that trial counsel were also ineffective at the sentencing phase,

arguing that their investigation and presentation of mitigating evidence was inadequate. Finding that Barrett was adamant that no mitigation evidence be presented, that Barrett refused to assist counsel in locating mitigation witnesses, and that trial counsel hired a private investigator to seek additional mitigating witnesses, the trial court concluded that trial counsel were not deficient, as they "did everything reasonably within their means to investigate mitigating evidence," and it denied Barrett's claim without addressing prejudice. See *Strickland*, 466 U. S. at 697 (stating that a court need not address both components of an ineffective assistance claim if the defendant makes an insufficient showing on one).

Barrett maintains that, while the trial court correctly recognized that his case is governed by this Court's decision in *Perkins v. Hall*, 288 Ga. 810 (708 SE2d 335) (2011), it erred in its application of that decision in concluding that trial counsel were not constitutionally deficient in their investigation and presentation of mitigation evidence. In *Perkins*, this Court noted that the ABA Guidelines in effect at the time of Perkins's trial "indicate[d] that trial counsel should conduct an investigation seeking possible evidence for the sentencing phase 'regardless of any initial assertion by the client that mitigation is not to be offered.'" See id. at 814 (II) (A) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989), 10.4.1 (C)). This Court then recognized that the guidelines in effect at the time of Perkins's trial "at first blush, might appear to be in tension with this Court's previous decisions indicating that the client is ultimately the master of his own defense, including whether or not to present *any* mitigating evidence." (Citations omitted; emphasis in original.) Id. This Court explained, however, that "reasonable attorney performance includes investigating mitigating evidence to the extent feasible given the defendant's willingness to cooperate and then, if the defendant insists, following his instructions regarding the ultimate defense to pursue." Id. at 815 (II) (A). The ABA Guidelines changed in 2003, however, and the relevant guideline in effect at the time of Barrett's trial stated that the sentencing phase investigation "should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be *collected or presented.*" (Emphasis supplied.) ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003), 10.7 (A) (2), reprinted in 31 Hofstra L. Rev. 913, 1015 (2003). Despite this change in the guidelines, we agree with Barrett that the holding enunciated in *Perkins* is applicable in determining whether trial counsel's investigation was deficient. See *Strickland*, 466 U. S. at 688, 691 (stating that the ABA Standards are "only guides," that the reasonableness of counsel's actions should be

evaluated in light of the defendant's own statements or actions, and that counsel's actions are properly based on information supplied by the defendant). However, this Court resolves Barrett's ineffective assistance claim on a different basis than the trial court did. After an independent review of the record, this Court concludes as a matter of law that, even assuming arguendo that trial counsel failed to investigate mitigating evidence to the extent feasible given Barrett's unwillingness to cooperate and, thus, were deficient, Barrett has failed to show that he was prejudiced. See *Lajara*, 263 Ga. at 440 (3).

Barrett maintains that, had trial counsel conducted a reasonable investigation and had other mitigation evidence prepared, perhaps they could have persuaded him to allow trial counsel to present it[14] just as they persuaded him to allow the presentation of Sutton's and Fortenberry's testimony.[15] In support of his claim, Barrett presented approximately 28 mitigation witnesses at the hearing on the motion for new trial. These new witnesses can be grouped into the following three categories: (1) family members; (2) individuals who were familiar with Barrett from his high school days; and (3) individuals who knew Barrett at or near the time of the incident.

In addressing the first group of new witnesses, Barrett's family members, this Court notes the following relevant testimony. At the hearing on the motion for new trial, Parks testified that, upon entering the case, he discussed with Barrett "the process" of presenting mitigation evidence and what evidence the defense could put forth; however, Barrett told him that he was not going to cooperate with any efforts to investigate mitigation, because he would "just as soon have the death penalty as a life sentence" if he were convicted.[16] Parks testified that, despite Barrett's resistance, he and Valpey had "constant," "virtually" daily discussions with Barrett about contacting his family members as mitigation witnesses, that Barrett "made

---

[14] Barrett's competency at the time of trial to make "the ultimate decision" regarding whether or not to present mitigation witnesses is not at issue. See *Morrison v. State*, 258 Ga. 683, 686 (3) (373 SE2d 506) (1988). Mears arranged for Barrett's pre-trial evaluation by an independent psychiatrist, and the results of that evaluation, which were available to Parks and Valpey, were that Barrett had "no major mental illness or cognitive disturbance," "[e]xhibit[ed] no brain organicity," had "intact" judgment, and had "good concentration, attention, and memory." Barrett has raised no issues regarding his mental competency or other mental health matters in his motion for new trial.

[15] Parks testified that, while Barrett hampered trial counsel's efforts by refusing to cooperate and to provide them with any names of potential mitigation witnesses, they learned about "some hopeful matters in mitigation" while interviewing Sutton and Fortenberry as fact witnesses in regard to guilt/innocence issues.

[16] Barrett confirmed before the trial court at the hearing on the motion for new trial that Parks "told the truth that I'd rather be dead instead of alive with the sentence, which was totally true."

it adamantly clear" that he did not want his family members called as mitigation witnesses "under any circumstances," that Barrett would not cooperate in any efforts to locate family members, and that Barrett's attitude never changed. Parks also testified that on multiple occasions he communicated to Barrett the importance of putting mitigation evidence before the jury, even as late as immediately before the defense's opportunity to present evidence at the sentencing phase, and that he thought that he was able to sufficiently impress upon Barrett the importance of presenting mitigation evidence. Valpey, who was the "lead dog" in the sentencing phase, also testified that Barrett was "very adamant" that trial counsel not pursue a mitigation defense if he were found guilty and that trial counsel not contact any family members, including his ex-wife, his son, and his stepson. Valpey also testified that Barrett denied trial counsel's repeated requests made even during trial that they be allowed to contact family members in order to present additional mitigation evidence. Trial counsel's testimony is corroborated by Barrett's ex-wife, who testified at the hearing on the motion for new trial that she and her two sons were living together out-of-state at the time of Barrett's trial and that Barrett communicated to her prior to his trial that he did not want them to testify.

Barrett presented no evidence contradicting trial counsel's testimony. Thus, it is undisputed that trial counsel specifically and repeatedly advised Barrett about allowing the introduction of mitigating evidence from his family members. Furthermore, trial counsel's clear, unambiguous, and unrefuted testimony that Barrett consistently maintained that he would not permit testimony from family members to be presented at trial is supported by Barrett's ex-wife's testimony. Therefore, Barrett cannot show that he was prejudiced by any alleged deficiency in trial counsel's failure to investigate and present this evidence. See *Schriro v. Landrigan*, 550 U. S. 465, 478 (127 SC 1933, 167 LE2d 836) (2007) (stating that "a defendant who refused to allow the presentation of any mitigating evidence could not establish *Strickland* prejudice based on his counsel's failure to investigate further possible mitigating evidence"); *Reed v. Secretary, Fla. Dept. of Corrections*, 593 F3d 1217, 1246, n. 19 (11th Cir. 2010); *Cummings v. Secretary, Dept. of Corrections*, 588 F3d 1331, 1359-1360 (11th Cir. 2009). Accordingly, we do not consider this particular mitigation evidence in our prejudice inquiry. See *Gilreath v. Head*, 234 F3d 547, 550, n. 10 (11th Cir. 2000) (assuming trial counsel were deficient in failing to present certain types of mitigating evidence but refusing to consider mental health and alcohol abuse mitigation evidence in the prejudice inquiry, where counsel discussed

presenting such evidence with the defendant and the defendant instructed counsel not to do so).

As to the second group of new witnesses, persons who knew Barrett from high school, most of these witnesses had had little or no contact with Barrett in approximately three decades, and at least two of these witnesses had never even had a personal relationship with him. The jury would not likely have found the testimony of these witnesses to be very relevant or reliable. Nor would the jury likely have found the testimony of several of these witnesses that Barrett was not violent to be particularly convincing in light of the family members' testimony that he had threatened to kill his sister and in light of the State's similar transaction evidence, which the jury was instructed that it could consider at the sentencing phase and which showed that, within approximately a year of shooting Youngblood, Barrett had assaulted a friend by striking him in the head with a gun and had pointed a gun about an inch from a friend's face and asked her if she were ready to die. The new mitigation evidence also would have risked the State's presenting as damaging rebuttal evidence at least some of the prior bad act evidence that, as discussed above, the State did not introduce at trial after trial counsel filed a pre-trial motion to prevent its admission. See *Johnson v. Upton*, 615 F3d 1318, 1338, n.18 (11th Cir. 2010) (noting that, had counsel "called a lot more witnesses as to Johnson's good character as an adult, the State would have done more on this score too"); *McMichen v. State*, 265 Ga. 598, 607 (12) (458 SE2d 833) (1995) (holding that evidence of a defendant's specific bad acts is admissible at the sentencing phase to show his character).

As to the third group of new witnesses, individuals that knew Barrett at the time of the incident, some of these witnesses did testify about Barrett's generosity, willingness to help those in need, like-ableness, reliability, kindnesses to women, and sports skills. However, much of the testimony is cumulative of that presented through the trial witnesses, including one whose testimony was more compelling than Barrett's new witnesses because he was the victim's own cousin. Much of the new testimony also contains the information that Barrett was heavily involved in partying that revolved around alcohol and drug use, evidence that the jury likely would not have found to be particularly mitigating. This Court has especially noted the testimony of one witness that Barrett "saved [her] life" when a friend pulled a knife on her and Barrett took the knife away before anyone could get hurt. However, the fact that this incident occurred over 20 years before Youngblood's shooting and that all the parties involved were using drugs and/or alcohol at the time it occurred would likely have undermined both the reliability and the mitigating effect of the

account in the eyes of the jury if evidence about it had been presented at trial. Compare *Schofield v. Gulley*, 279 Ga. 413, 416 (I) (A) (614 SE2d 740) (2005) (finding that trial counsel rendered prejudicially deficient performance in failing to investigate and present mitigation evidence that they were aware of that the defendant had saved the lives of two people). All things considered, this Court concludes that Barrett failed to show that, but for trial counsel's alleged deficiencies, there was a reasonable probability of a different outcome at the sentencing phase of his trial.

*(e) Combined effect of alleged errors.* Barrett asserts that the trial court erred in failing to consider the combined prejudicial effect of trial counsel's deficiencies. See *Schofield v. Holsey*, 281 Ga. 809, 811-812, n. 1 (642 SE2d 56) (2007). However, considering the combined effect of the deficiencies we have assumed in the discussion above, we conclude that those deficiencies would not in reasonable probability have changed the outcome of either phase of Barrett's trial. See id. Therefore, Barrett's claim can provide him no relief.

4. Relying on 17 cases that he claims are similar to his own in which the defendant did not receive a death sentence, Barrett alleges that his death sentence is disproportionate to sentences imposed in similar cases. However, "[t]his Court views a particular crime against the backdrop of *all* similar cases in Georgia in determining if a given sentence is excessive per se or substantially out of line." (Emphasis supplied.) *Gissendaner v. State*, 272 Ga. 704, 717 (19) (a) (532 SE2d 677) (2000). See *Terrell v. State*, 276 Ga. 34, 46 (572 SE2d 595) (2002) (Fletcher, C. J., concurring) (stating that this Court "does not determine whether the death sentence under review represents a large or small percentage of sentences in factually comparable cases" but, instead, examines the sentence "to ensure that it is not an anomaly or aberration"). The evidence construed to support the verdicts showed that Youngblood was a guest in Barrett's home. While Youngblood behaved badly, he was intoxicated to the point that he was helpless to defend himself, and, despite his provocative behavior, Ms. Barrett considered him to be no threat to her. Disregarding his wife's and the victim's repeated pleas to stop his relentless attack, Barrett pistol-whipped Youngblood, tossed him around like a "rag doll," stomped or kicked him, and gouged his eye so severely that a GBI agent and Barrett's own attorney thought that he had been shot in the eye. Then Barrett kicked Youngblood in the abdomen with sufficient force to move his 200-plus-pound body several feet before shooting him at point blank range as he tried to comply with Barrett's demand that he get in his truck and leave. Barrett's expert at the hearing on the motion for new trial testified that Youngblood suffered a "significant beating." Barrett, however, had no discernable injuries that were

substantiated as being attributable to the fight. The similar transaction evidence and non-statutory aggravating evidence presented by the State showed Barrett's increasing propensity when angered to resort to violence, often with the use of a gun, until it eventually culminated in Youngblood's death.

The cases in the Appendix support the imposition of the death penalty in this case in that all involve a murder committed during the commission of an aggravated battery or a murder involving the (b) (7) aggravating circumstance. Several also include evidence that the victim had engaged in some provocative behavior. These cases show the willingness of juries to impose the death penalty under these circumstances. "Rarely, if ever, will the facts surrounding two capital felony cases be exactly alike and we are not required to find identical cases for comparison in our proportionality review." *Wilson v. Zant*, 249 Ga. 373, 388 (6) (290 SE2d 442) (1982), overruled on other grounds by *Morgan v. State*, 267 Ga. 203, 204-205 (2) (476 SE2d 747) (1996). Rather, we are required to "determine whether the defendant's sentence of death is excessive in comparison to the sentences imposed in 'similar cases' upon 'similarly situated defendants.' " Id. (citing *Gregg v. Georgia*, 428 U. S. 153, 198 (96 SC 2909, 49 LE2d 859) (1976); [OCGA § 17-10-35] (c) (3)). Considering the murder and the defendant, we find that Barrett's death sentence is not disproportionate within the meaning of Georgia law. See OCGA § 17-10-35 (c) (3).

5. The evidence presented at trial was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt the existence of the statutory aggravating circumstances in this case. See *Ring v. Arizona*, 536 U. S. 584 (122 SC 2428, 153 LE2d 556) (2002); *Jackson*, 443 U. S. at 307; OCGA § 17-10-35 (c) (2). We conclude that Barrett's death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See OCGA § 17-10-35 (c) (1).

*Judgments affirmed. All the Justices concur.*

APPENDIX.

*Arrington v. State*, 286 Ga. 335 (687 SE2d 438) (2009); *Walker v. State*, 281 Ga. 157 (635 SE2d 740) (2006); *Braley v. State*, 276 Ga. 47 (572 SE2d 583) (2002); *Terrell v. State*, 276 Ga. 34 (572 SE2d 595) (2002); *Drane v. State*, 271 Ga. 849 (523 SE2d 301) (1999); *Mize v. State*, 269 Ga. 646 (501 SE2d 219) (1998); *Carr v. State*, 267 Ga. 547 (480 SE2d 583) (1997); *Hittson v. State*, 264 Ga. 682 (449 SE2d 586) (1994), overruled on other grounds by *Nance v. State*, 272 Ga. 217 (526 SE2d 560) (2000), and *Henry v. State*, 278 Ga. 617 (604 SE2d 826)

(2004); *Conklin v. State*, 254 Ga. 558 (331 SE2d 532) (1985); *Conner v. State*, 251 Ga. 113 (303 SE2d 266) (1983).

DECIDED OCTOBER 15, 2012 —
RECONSIDERATION DENIED NOVEMBER 27, 2012.

*John R. Martin, Sandra L. Michaels*, for appellant.
*W. Jeffrey Langley, District Attorney, Christopher M. Foss, Assistant District Attorney, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Senior Assistant Attorney General, Dana E. Weinberger, Assistant Attorney General*, for appellee.