295 Ga. 536
FINAL COPY

S14A0395. HUMPHREY v. WILLIAMS.

NAHMIAS, Justice.

In 2002, a jury in Decatur County convicted Jimmie Ray Williams of sexually molesting his 13-year-old stepdaughter and her 14-year-old friend in 2000, after a trial at which his 20-year-old daughter was allowed to testify, as a similar transaction, that Williams touched her sexually four times in one night in 1993, when she was 11 years old and living with him in Florida. The trial court sentenced Williams to serve a total of 20 years in prison followed by 20 years on probation, and the Court of Appeals affirmed in Williams v. State, 263 Ga. App. 22 (587 SE2d 187) (2003).

In August 2004, Williams filed a pro se petition for habeas corpus alleging, among other claims, that Billy Grantham, his attorney at trial and on direct appeal, provided ineffective assistance of counsel. Williams claimed that Grantham conducted a deficient pretrial investigation by failing to obtain Florida court records showing that the alleged similar transaction never took place. Williams argued that if Grantham had conducted a competent investigation and found those records, his daughter's testimony would have

been excluded before trial or successfully impeached at trial, creating a reasonable probability that the trial verdict would have been more favorable to Williams.

The habeas court initially denied Williams's petition in November 2006, but in January 2008 this Court granted his application to appeal and vacated that judgment because the habeas court had not allowed Williams a full and fair opportunity to present his claims. On remand, at a new evidentiary hearing in October 2008, Williams presented the Florida court records and showed that they were readily available to Grantham at the time of trial. On December 31, 2012, the habeas court entered a detailed order setting aside Williams's convictions. The court concluded that Grantham's investigation of the alleged similar transaction was professionally deficient and that, but for counsel's failure to obtain the Florida records, there was a reasonable probability that the outcome of Williams's trial would have been more favorable to him, because his daughter's testimony would have been either excluded or successfully impeached.

The Warden now appeals, arguing, among other things, that reversal is required because the Florida court records on which the habeas court based its

2

finding of ineffective assistance of counsel were never admitted into evidence in the habeas proceedings; the court erred in finding deficient performance; the court erred in finding prejudice based on its erroneous determination that the Florida records amounted to acquittal evidence that collaterally estopped the admission of the similar transaction testimony under this Court's decision in Moore v. State, 254 Ga. 674 (333 SE2d 605) (1985); and the court erred in finding prejudice because of the "overwhelming evidence" of Williams's guilt, aside from the similar transaction testimony, that was presented at trial.

As we explain below, the record shows that the Florida court records were in fact admitted into evidence at the 2008 habeas hearing, and we agree with the habeas court that Grantham's investigation of the alleged similar transaction was professionally deficient. The Warden is right that the habeas court erred in treating the Florida records as acquittal evidence precluding the admission of the similar transaction testimony, but the Warden is wrong in his assertion that the evidence at Williams's trial, aside from the similar transaction evidence, was overwhelming. Instead, the habeas court correctly concluded that if Grantham had obtained and used the Florida court records, the similar transaction testimony would have been either excluded or convincingly refuted at trial, and

3

there is therefore a reasonable probability that the outcome of the trial would have been more favorable to Williams. Accordingly, we affirm the habeas court's judgment.[1]

1. Our evaluation of the Warden's arguments requires a detailed review of what the record shows regarding how the 2002 case against Williams arose, the evidence that was presented at the similar transaction hearing and at trial, and the additional evidence that was presented during the habeas corpus proceedings.

(a) Background. In January 2000, Williams, who was then 38 years old, was living in a double-wide trailer in Decatur County with his then-wife, Jonell Williams ("Jonell"); their four-year-old son; and Jonell's two daughters from a prior relationship, a nine-year-old and a 13-year-old, whom we will refer to as Stephanie. While Jonell was out of town for a week on business, Stephanie invited her 14-year-old friend and classmate, whom we will call Amanda, to sleep over on the night of Monday, January 24, 2000. Joe, a 17-year-old family

---

[1] The habeas court also set aside Williams's convictions based on other claims of ineffective assistance of counsel, and the Warden also challenges that ruling. Because we hold that the habeas court properly set aside the convictions based on ineffective assistance of counsel with regard to the similar transaction evidence, we need not address the Warden's other enumerations of error.

4

friend who lived a few lots up the road, walked over to the Williams residence just before dark that evening. Williams and Joe drank some whiskey together, and at some point, Amanda and Stephanie also drank whiskey, getting heavily intoxicated to the point that they vomited. Amanda and Stephanie were hung over the next day, and Williams allowed them to stay home from school. After she returned to town, Jonell reported to the Department of Family and Children Services (DFACS) that Amanda and Stephanie had gotten drunk and skipped school, and DFACS conducted an investigation. In separate interviews at their school, Amanda and Stephanie said that they snuck into Williams's whiskey and got drunk while he was outside repairing his truck with a friend. There was no mention that Amanda had sex while at the Williams residence, or of any sexual behavior by Williams toward either girl at any time, and DFACS took no action against Williams.

Over two years later, in March 2002, Stephanie told her mother Jonell that she wanted to go live with her father and would run away from home if Jonell said no. Jonell questioned Stephanie over three to four days about her suddenly expressed desire to go live with her father, and Stephanie provided a number of different explanations. Finally, after an hour-long discussion about why she

5

wanted to live with her father so much, Stephanie told Jonell that it was because Williams had been sexually inappropriate with her on several occasions in 2000. Jonell took no immediate action, but some time later, when Jonell and Williams were arguing, Jonell told him about Stephanie's claim and said that she wanted a divorce and that he needed to quit his job and move as far away from her as he could. Williams denied molesting Stephanie. Two days later, Jonell reported Stephanie's allegations to the Decatur County Sheriff's Office (DCSO), which removed Williams from the trailer the same day and arrested him.

A few days later, Jonell contacted DCSO Investigator Frank Green and told him that he needed to speak with Williams's adult daughter, Jessica, who lived in Florida. (Decatur County borders on Florida.) On Friday, March 29, 2002, Investigator Green conducted a telephone interview of Jessica while she was at Jonell's trailer visiting Jonell for the weekend. According to Green, Jessica said that one night when she was in elementary school and living in Florida, she was asleep in bed with her younger brother in their bedroom when Williams, who was drunk, came into the room and started rubbing her over her underwear "in the vagina area, on her buttocks"; he left the room when Jessica told him to stop but came back again three times that night and did the same

6

thing; and that night was the only time that Williams touched her inappropriately. Jessica also told Green that the incident was reported to the Florida equivalent of DFACS, which conducted an investigation. Green later obtained a report of some kind from the Florida agency that placed the date of the incident around February 1993, when Jessica was 11 years old. In addition, in early April 2002, Jonell reported to the DCSO that Williams had admitted to her in a telephone conversation on April 2 that he had consensual sexual intercourse with Amanda during the January 2000 sleepover.

On May 7, 2002, Williams was indicted for statutory rape and child molestation for allegedly having sexual intercourse with Amanda on the night of January 24-25, 2000; three counts of child molestation for allegedly masturbating in front of Stephanie in February or March of 2000, exposing his penis to Stephanie and asking her to touch it sometime during the months of May through August 2000, and fondling Stephanie's vaginal area in December 2000; and contributing to the delinquency of a minor for allegedly furnishing alcohol to Amanda and Stephanie on the night of January 24-25, 2000. Billy Grantham, an experienced criminal defense lawyer, was appointed to represent Williams.

(b)    The Similar Transaction Hearing.  On July 30, 2002, the trial court

held a pretrial evidentiary hearing to determine if similar transaction evidence

relating to the alleged 1993 incident involving Jessica could be admitted at trial.[2]

Investigator Green testified and recounted the substance of his telephone

interview with Jessica.  Grantham cross-examined the officer perfunctorily, but

he presented no witnesses for Williams and offered no exhibits for the trial court

to consider.  In arguing that the court should exclude the similar transaction

evidence, Grantham asserted that the alleged prior incident was too remote in

time and that the acts that Williams allegedly committed in 1993 and in 2000

were not sufficiently similar, because there was no allegation that the 1993

_____

[2]  Uniform Superior Court Rule 31.3 (B) requires the trial court, after proper notice to the defendant by the prosecution of its intent to present evidence of a similar transaction, to hold a hearing out of the presence of the jury to determine if the State may present the similar transaction evidence at trial.

> Evidence of a similar transaction may be admitted if the State shows that:  (1) it seeks to introduce the evidence "not to raise an improper inference as to the accused's character, but for some appropriate purpose which has been deemed to be an exception to the general rule of inadmissibility"; (2) "there is sufficient evidence to establish that the accused committed the independent offense or act"; and (3) "there is a sufficient connection or similarity between the independent offense or act and the crime charged so that proof of the former tends to prove the latter."

Matthews v. State, 294 Ga. 50, 52 (751 SE2d 78) (2013) (quoting Williams v. State, 261 Ga. 640, 642 (409 SE2d 649) (1991)).  We note that this case was tried under Georgia's old Evidence Code.  Under our new Evidence Code, which applies to trials beginning on or after January 1, 2013, the admissibility of this sort of "[e]vidence of other crimes, wrongs, or acts" is governed by OCGA § 24-4-404 (b).

incident included furnishing alcohol to Jessica or having sex with her, masturbation, or exhibiting of the penis. Grantham's only mention of the second requirement for admissibility under Williams v. State, 261 Ga. 640, 642 (409 SE2d 649) (1991) — whether there was sufficient evidence to prove that Williams committed the prior act of child molestation — was a passing statement that, "other than hearsay, there has been nothing to show that Mr. Williams committed these allegations." The trial court ruled that evidence concerning the 1993 incident with Jessica was admissible to prove the allegations that Williams molested Amanda and Stephanie in 2000 by showing his intent, course of conduct, modus operandi, or common scheme.

(c) The Trial. Williams's trial took place on November 5-6, 2002.

(1) The State's Case-in-Chief. The State called five witnesses: Amanda, Joe, Stephanie, Jonell, and Jessica. Amanda, who was 17 by the time of trial, testified that she spent the night of January 24-25, 2000, at the Williams residence and that after Stephanie's little sister and little brother went to bed around 8:00 p.m., Williams drank whiskey with her, Stephanie, and Joe, and they all got drunk. Amanda said that sometime between 10:00 p.m. and midnight, Stephanie and Joe went outside and Williams got up from his recliner

9

and sat next to her on the couch. According to Amanda, Williams rubbed her legs all the way up to her vaginal area and then pushed her into his and Jonell's bedroom, threw her onto the bed, removed her clothes and his, climbed on top of her, and inserted his penis into her vagina, all while she was trying to make him stop. Amanda testified that after Williams was through, he went back to the living room, and she stayed in the bed and cried herself to sleep. Amanda said that she did not see Stephanie or Joe again the rest of the night. Amanda testified that she did not tell anyone what had happened until "it all came up in April" of 2002. On cross-examination, Amanda reiterated that before the spring of 2002, she never told anyone, including Stephanie and the woman from DFACS who interviewed her at her school shortly after the sleepover, that Williams had sex with her.

Joe testified that on January 24, 2000, Stephanie called and invited him over, and he went over and drank whiskey with Williams, Amanda, and Stephanie until around 10:00 p.m., when Stephanie grabbed the whiskey bottle off the table in the living room and ran outside. Joe said that he chased after Stephanie, caught up with her on the trampoline in the backyard, took the bottle away from her, and then led Stephanie back inside and put away the whiskey for

the night. According to Joe, he was outside with Stephanie for no more than five or ten minutes. Joe said that when they walked back inside the trailer, Williams was coming out of his bedroom and said that Amanda had gotten sick. Joe testified that he did not see Amanda again that night and that he spent the rest of the evening watching television in the living room with Stephanie and Williams until around 12:30 or 1:00 the next morning, when he walked home. Joe said that he returned to the Williams residence around 1:00 p.m. on January 25 and was standing inside the trailer by the back door when Amanda told him and Stephanie that she and Williams had sex the night before. On cross-examination, Joe admitted that he never saw Williams touch Amanda in any way.

Stephanie, who was 16 by the time of trial, testified consistently with Amanda and Joe about the drinking on the night of January 24, 2000, but her testimony differed from theirs in some notable ways. For example, Stephanie denied calling Joe and inviting him to come over that night. She also testified that Amanda was in the living room with Williams when Joe brought her back inside after she ran outside with the whiskey bottle and that Amanda then sat beside her on the couch for the rest of the evening until Stephanie fell asleep

11

around 2:00 a.m., after Joe had walked home. Stephanie was uncertain how long she was outside with Joe, but she remembered clearly that Amanda spent two nights in a row at the Williams residence — January 24 and 25 — and that they spent all day January 25 drinking whiskey with Williams and Joe (although Joe had testified that they drove Amanda home on the afternoon of January 25). According to Stephanie, on the morning of January 25, she saw Amanda come out of Williams and Jonell's bedroom wearing one of Williams's shirts, and Amanda stayed by her side all day long and was quiet but denied that anything was wrong when Stephanie asked. Stephanie testified that Amanda never told her about having sex with Williams and that she and Amanda never discussed the incident until shortly before the trial in November 2002.

Stephanie also testified that Williams was sexually inappropriate with her in 2000. She told the jury that Williams gave her "crank" (methamphetamine) and marijuana, masturbated in front of her, and made lurid comments on Easter Sunday 2000 and again once that summer when he also asked her to touch his penis. Stephanie also said that in late December 2000, Williams pushed her up against a wall, shoved his hand in her underwear, and asked permission to "finger" her vagina, but she said no and got away by distracting him with the

12

false claim that she saw Jonell's car coming up the road. Stephanie testified that Williams made sexually suggestive gestures and comments toward her on two other occasions in 2000 as well and threatened to kill her and Jonell if he ever heard that Stephanie told Jonell what he was doing to her. On cross-examination, Stephanie said that Williams was mean to her, made her obey him, and did not want her misbehaving; acknowledged that she had gone to live with her father about six weeks before the trial; and reiterated, contrary to both Amanda's and Joe's differing testimony on the point, that Amanda never told her anything about what happened between her and Williams until about two weeks before the trial. Stephanie also indicated that she did not tell anyone about Williams's sexually inappropriate behavior and comments to her in 2000 until the March 2002 conversation with Jonell.

Jonell then testified that when she returned from her business trip in January 2000, she found strange hair fasteners in her bed and confronted Williams and Stephanie, who told her that Amanda spent the night and that the girls got drunk and skipped school but that nothing else happened. Jonell said there was no mention of sex. Jonell recounted how she found out in 2002 "what [Stephanie] had to tell [her]" but did not relate the specifics of Stephanie's

13

allegations, and she denied collaborating with Stephanie to get Williams out of the trailer. Jonell also said that until about six weeks before the trial, Jessica had been coming up from Florida every weekend to stay with her. Jonell testified about her April 2, 2002 telephone conversation with Williams, claiming that he admitted to her during that call that he had sex with Amanda during the January 2000 sleepover. On cross-examination, Jonell conceded that Williams told her in the same conversation that Amanda and Stephanie were both lying.

The State's closing witness in its case-in-chief was Jessica, who testified that one night when she was 11 and living in Florida, Williams was drunk and came into her bedroom, lay down beside her on the bed, and started rubbing on her behind, over her underwear but underneath her shirt. Jessica said that she pushed Williams out of bed and told him to stop, and he left but came back three other times that night and did the same thing. Jessica also said that the incident was reported to Florida's equivalent of DFACS and she was placed in a foster home, then put with Williams's mother, and later on returned to Williams. Jessica also testified that Williams had told her about two years before his November 2002 trial that Amanda and Stephanie were sneaking into his alcohol, Stephanie was on the trampoline with a boy, Amanda was passed out in his bed,

14

and he had sex with Amanda. According to Jessica, Williams said that Jonell knew about the sex with Amanda and was mad, but he asked Jessica not to say anything to Jonell because Jonell did not want anyone else knowing about it. On cross-examination, Jessica added that Williams told her that he was outside repairing a vehicle with a friend when Amanda and Stephanie snuck into his liquor. Jessica was asked if what Williams actually told her was that he had been *charged* with having sex with Amanda, but Jessica said no, claiming not to have known anything about charges when her conversation with Williams took place.

The State also introduced three exhibits at trial: a picture of Stephanie taken on Easter Sunday 2000; a pair of swim trunks with the lining cut out that Williams frequently wore around the trailer, which Stephanie said he had on once with his feet propped up and his legs spread so that she could "see like his private part or whatever hanging out"; and an August 2002 letter from Williams to Joe, which is not in the record on appeal. According to Joe, the letter "was about this court case, saying that they was trying to get me. They was trying to turn everything against me. They were trying to get me in the same process as him. . . . He told me not to come."

15

(2)    <u>The Defense Case</u>.  Recognizing the importance of the similar transaction evidence, Grantham's defense of Williams began by calling four family members to counter Jessica's testimony that Williams had touched her inappropriately in 1993.  The first two defense witnesses were Williams's sisters — Jessica's aunts.  Tracey Baggett testified that after Jessica made her allegation against Williams, she and her younger brother were put in foster care and then placed with her and Williams's mother for a while, but "the State" ultimately gave the children back to Williams.  On cross-examination, the prosecutor challenged Baggett's assertion that a legal process resulted in the children's return to Williams, saying, "Now that's not really what happened, is it . . . ?"; and, "Your mother gave them back to [Williams], is that not correct, rather than the State?  Or do you know?"  When Baggett replied, "As far as I know, she was ordered to," the prosecutor said, "Now do you have any documents to back up the statement that the children were given back to . . . [Williams]?" Baggett answered, "No, I don't."  The other sister and aunt, Linda Crumney, testified that Jessica told her in 1993 that Williams "had tried to kiss her.  That's all."  She said that Jessica made this allegation after her mother kidnapped her and her little brother from Crumney's front yard.  When Crumney

16

testified that Williams later was awarded custody of Jessica, the prosecutor said, "your mother had the children . . . . She actually, without any kind of court order, gave them back to [Williams], didn't she?" Crumney replied, "No, he got court-ordered. He went to court for custody of the kids."

Mary Ann Smith, Williams's mother and Jessica's grandmother, testified that Jessica made shifting allegations against Williams in the context of a custody battle with Jessica's mother and that Jessica's allegations were investigated and shown to be false. She recounted one "far-out story" that Williams watched Jessica shower through a tiny hole by the faucets, which the investigation found was impossible, because the hole was completely blocked on the other side of the wall by the hot water heater. Finally, Charles Williams, Jessica's younger brother, testified that he was living with Williams and Jessica in 1993 when Jessica made her claim against Williams, and that he and Jessica shared a bedroom and a bed. He also testified that there was an investigation into Jessica's accusation, that he and Jessica were placed in a foster home and then put with their grandmother, and that they eventually returned to Williams's custody.

The defense then turned to the allegations regarding Stephanie, with

17

Grantham calling two friends of Williams. Patricia Schneck, who lived down the road from the Williams trailer, testified that she had two daughters around Stephanie's age who rode the school bus with her. Schneck said that Jessica called her in September 2002 for advice, saying that she wanted to speak with someone outside the family. According to Schneck, Jessica said that when she was visiting the Williamses in December 2001 and sleeping in Stephanie's bedroom with Stephanie, Jonell came back there and took Stephanie into Williams and Jonell's bedroom while Williams was asleep in his recliner; when Stephanie came back, she told Jessica that Jonell had been questioning Stephanie about personal things like whether Williams ever tried to kiss her or tried to touch her or her friends. Schneck testified that Jessica said she asked Stephanie whether it was true, and Stephanie replied, "not a bit of it." On cross-examination, Schneck said that she had conveyed this information to specific DCSO officers. Brian Kearns, the other friend Grantham called for the defense, was a longtime neighbor of the Williamses. He testified that Stephanie frequently got very mad at Williams because he was firm with her about doing her homework and her chores. Kearns denied on cross-examination that Williams was a heavy drinker.

18

Finally, Grantham called Williams to testify. Williams denied ever touching Jessica, Amanda, or Stephanie inappropriately. He testified that Jessica's 1993 allegations arose after her mother kidnapped her and her younger brother and drove out of town with them, and a Florida court ordered her to surrender the children to Williams. According to Williams, Jessica's mother then told the Florida court that he had touched Jessica inappropriately, and the children were placed in foster care before being put with Williams's mother; the court sent Williams and the children's mother to counseling; and in the end the court gave Williams final custody of the children. Williams acknowledged talking to Jessica about his current charges but suggested that she had gotten confused, claiming that what he told her was that he had been *accused* of having sex with Amanda at the January 2000 sleepover. Williams also admitted saying something about Amanda and consensual sex in a telephone conversation with Jonell on April 2, 2002, but said that he was referring to the fact that Amanda had sex with Joe that was consensual, not that he and Amanda had sex. He insisted that Jonell knew by April 2 that Amanda had sex with Joe in their bed during the January 2000 sleepover.

Williams then testified that on January 24, 2000, while he was outside

19

working on his truck with Joe, Amanda and Stephanie snuck into a bottle of whiskey that a customer of his had given him and got really drunk, noting that both girls told DFACS the same thing in their separate interviews in 2000. Williams admitted that he served Joe whiskey but said he thought at the time that Joe was 19 and Joe had a beer in his hand when he walked over that evening. According to Williams, he fell asleep in the recliner in the living room and Joe woke him up around 10:30 p.m., yelling that Stephanie had gotten his whiskey bottle and taken it outside; Stephanie came inside cursing and staggering, and Williams told her to take a bath, sober up, and go to bed; he talked with Joe for a few minutes and fell asleep again in his recliner; and when he awoke again and walked into his bedroom, he saw Joe on the bed "screwing" Amanda. Williams said that after that, Stephanie came back to the living room and sat on the couch with Joe before going into his and Jonell's bedroom and talking to Amanda for a few minutes. Williams testified that Joe and Amanda had sex again on January 25.

Williams denied all of Stephanie's accusations of sexual misconduct. Williams said that Jonell and Stephanie had told several people before the allegations of abuse arose in 2002 that they wanted him out of the trailer, which

20

Williams said he owned. According to Williams, Stephanie wanted him out because, unlike Jonell, he was a strict disciplinarian, and Jonell wanted him out because their relationship soured when he discovered that Jonell was cheating on him, had stolen from him, and had secret checking accounts, telephone numbers, and Post Office boxes. Regarding the State's exhibits, Williams said that Jonell gave him the swim trunks he wore around the house for a trip to the beach; they were too tight on his legs and chafed so he cut out the lining; but they were still tight on him, making it impossible for Stephanie to have seen his genitals as she claimed. Williams admitted writing the August 2002 letter to Joe but said he was only trying to warn Joe that it was going to come out at trial that Joe had sex with Amanda. Williams said that he had told both Jonell and Grantham that he wanted Joe subpoenaed to testify at his trial.

The defense then rested. Grantham made no attempt to introduce documents from the Florida proceedings to support the testimony of the defense witnesses that Jessica's 1993 allegations were false and were so found by a Florida court, which in fact ordered Jessica to be returned to Williams's custody.

(3)   The State's Rebuttal Case. The State called Stephanie and Joe again in rebuttal. Stephanie testified that she knew that Joe did not have sex with

21

Amanda at the January 2000 sleepover, because he chased after her when she ran outside with the whiskey bottle and sat next to her on the couch when they came back inside until he walked home. She denied telling anyone that she made up her accusations against Williams to get him out of the house and denied ever talking to Jessica about them. On cross-examination, Stephanie denied that Jonell had questioned her before March 2002 about whether Williams molested her. Joe testified that he did not have sex with Amanda, had not previously been accused of doing so, and was unaware that Williams had made such an accusation. On cross-examination, he said he was aware that Amanda was 14 in January 2000.

After the evidence was closed, the trial court asked Williams if he was satisfied with Grantham's performance. Williams replied that he wanted Grantham to call additional witnesses and to introduce

> Florida HRS records to prove I was given custody of my kids and that these allegations were false allegations in Florida. I wanted him to subpoena them to court. The counselor's recommendations that I get custody of my kids. And the fact that my daughter had lied to the counselor about this and then later admitted it, I would like for that to have been brought into court.

The trial court offered to "postpone this case for another day or two and see

22

about getting those things here," and Williams said, "All right." At that point, however, Grantham intervened and asked the court if he could have an opportunity to discuss the matter with Williams. Grantham and Williams stepped into a side room for a few minutes, and when they returned, Grantham told the court that Williams did not want the trial to be continued and that they had discussed that "the information [Williams] wanted subpoenaed, we feel is already in the case sufficiently." The court then inquired of Williams directly, who confirmed that, based on Grantham's legal advice, he wanted to proceed with the trial.

(4) The Closing Arguments. Grantham's closing argument focused on the credibility of the five witnesses against Williams. He attacked Jessica's credibility by telling the jury, "Don't you know that the Florida courts would have never let [Williams] have her back if they thought for one minute that he had been molesting her?," and, "Jessica . . . needs for you to believe that she was touched in '93. She needs that because she made the claim and she has been called a liar by the courts in Florida. And she needs vindication for that." The prosecutor began his closing argument by saying, "I would like to straighten out something that Mr. Grantham said. There is not the first bit of evidence that

23

Jessica was not believed by a Florida court. Whether you believe Jessica or not is up to you." The prosecutor added that the fact that "Jessica eventually went back to [Williams] . . . in no way says that Jessica told you anything false on that stand" and described Jessica as a "reluctant witness" who told the jury "the truth about what happened in 1993." He continued:

> Contrary to what Mr. Grantham told you, there was not this tale and that tale. She said what he did was come into her bed, drunk, four times in one night, reach his hand up under her skirt and rubbed her on the buttocks over the top of the panties, and that's what the similar offense was, and that is it and that is why she left the home, entered a period of counseling, intervention by the court . . . .

Like Grantham, the prosecutor repeatedly emphasized that the jury's task was to determine whether to believe the testimony of Williams on the one hand, or the testimony of Amanda, Stephanie, and Joe on the other. He urged the jury to "judge [Williams's] credibility" based not only on his testimony at trial but also on "what he has done in the past." Near the end of the State's argument, after emphasizing how hard it is for sexually abused children to come forward and report the abuse, the prosecutor said, "I ask you to believe [Stephanie] and Amanda, I ask you to believe Jessica, . . . because the evidence is there to support what they have said."

(5)   The Verdict and Sentence. On November 16, 2002, the jury found Williams guilty of all charges. The trial court merged the guilty verdict for statutory rape into the guilty verdict for molesting Amanda and dismissed the guilty verdict for contributing to the delinquency of a minor, which was barred by the two-year statute of limitations for misdemeanors.[3] The court then entered four judgments of conviction for child molestation and sentenced Williams to serve a total of 20 years in prison followed by 20 years of probation.

(d)   The Direct Appeal. Grantham continued to represent Williams post-trial. Instead of filing a motion for new trial, Grantham filed an immediate notice of appeal. In his brief to the Court of Appeals, Grantham raised two enumerations of error: the legal sufficiency of the evidence to support Williams's convictions, and the trial court's admission of the similar transaction evidence. Grantham did not argue that the 1993 incident did not occur, only that it was not sufficiently similar to the incidents in 2000 charged in the indictment. The Court of Appeals affirmed. See Williams, 263 Ga. App. 22.

---

[3] The two-year limitations period expired before the indictment was returned, but Grantham never sought dismissal of this charge. It was only after the jury found Williams guilty and the trial court was preparing to sentence him that the prosecutor brought to the court's attention that Williams could not legally be convicted or sentenced on this count.

The court held that the evidence presented at Williams's trial was legally sufficient to support his child molestation convictions, noting that the credibility of Amanda and Stephanie "was a matter for the jury to determine, and the jury chose to believe their testimony that the charged acts occurred." Id. at 23-24. The court then rejected Williams's challenge to the similar transaction evidence because "[a]ll of the incidents involved inappropriate sexual activity with or in the presence of a minor female child"; "[t]he similar transaction, like many of the charged offenses, occurred when Williams had been drinking alcohol or using drugs"; and "Williams's claim that the prior act was too remote in time goes to the weight and credibility of the evidence, not its admissibility." Id. at 24.

(e)    The Habeas Proceedings. On August 25, 2004, Williams filed a pro se petition for habeas corpus, alleging ineffective assistance of counsel and other claims. On July 21, 2005, Senior Judge William Neville, sitting by designation, held a hearing at which Grantham and Williams testified, and on November 6, 2006, the court entered an order denying the petition. On January 8, 2008, this Court entered an order granting Williams's application for a certificate of probable cause to appeal; vacating the judgment because Judge Neville had

26

denied Williams a full and fair opportunity to present his claims at the habeas hearing; and remanding for a new hearing.

On October 27-28, 2008, Judge Dwayne Gillis held a hearing at which Grantham, Williams, Baggett, Crumney, Williams's mother, a brother of Williams, Schneck, and Schneck's daughter Tracey testified. Among other exhibits, the habeas court admitted into evidence documents relating to Jessica's 1993 claim of sexual abuse by Williams that Williams had obtained from the Juvenile Division of the Circuit Court, Second Judicial Circuit, in and for Gadsden County, Florida (the "Florida Court").

The Florida Court documents do not mention any allegation by Jessica that Williams got into bed with her, put his hand under her shirt, and rubbed her behind over her underwear four times in a single night. Instead, the petition for dependency filed by the Florida Department of Health and Rehabilitative Services ("HRS") on March 10, 1993, alleged that Jessica's only claim of sexual abuse against Williams was that he "kissed her and inserted his tongue in her mouth" and "told her that she would get anything she wanted if she would have sex with him for ten minutes." An April 1994 report by a social worker, John H. Paschal, which was prepared at the Florida Court's request based on ten

27

months of bi-weekly counseling sessions with Jessica, stated that Jessica had "told conflicting and confusing accounts of alleged misconduct by her father," found that there was "no conclusive evidence of any wrongdoing by Mr. Williams," and concluded that "[i]t is my clinical opinion that . . . no actual abuse occurred." A letter evaluation dated April 13, 1994, which was sent to Paschal by Gadsden District Schools psychologist Charlotte Davis, Ph.D., reported that Jessica "has difficulty getting along with other students," "tries to control others by using rumors and gossip," and "lies easily and shows little remorse when her behavior causes problems for others." And a joint report and recommendation to the Florida Court, prepared by an HRS attorney and an HRS counselor and dated April 22, 1994, said that Jessica "seeks revenge for the slightest infraction of her rules" and "starts rumors she knows are not true to save face."

A September 1, 1994, order by the Florida Court recited that it was based on testimony from the parties and Paschal's report and found that "[i]t is in the best interests of the children to have liberal visitation with their father." A January 4, 1996, court order likewise found, on the basis of testimony from the parties and the joint report of the HRS attorney and counselor, that "[i]t is in the

best interest of the children that they remain in the care and custody of their father, Jimmy Williams, with protective services supervision of [HRS] terminated."

At the habeas hearing, Williams's mother testified that she had obtained most of the Florida Court documents the week after his trial from the courthouse in the adjacent county; she said that the records were "easy [sic] accessible" and "in no way confidential." At Williams's request, she had then called Grantham and told him that she had the documents, but Grantham "said they wouldn't have any bearing on the case. But for me to take those documents and put [them] in a safe place where I'd always know where they was at because I might one day need them again for [Williams]."

Grantham was also questioned about what happened at trial during the sidebar at the end of the defense case, when Williams expressed dissatisfaction with Grantham's representation due to his failure to call additional witnesses and introduce records from the Florida case. Grantham said:

> I explained to you that we had pretty well established with the jury that you didn't do the 1993 incident. You wanted to be sure the jury understood you had custody of your children again. And I think that was perfectly clear to them.

On December 31, 2012, the habeas court entered an order granting Williams's habeas petition and setting aside his 2002 convictions based on ineffective assistance of counsel under the test set forth in Strickland v. Washington, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984). The court concluded that Grantham was professionally deficient in failing to obtain the Florida Court records that were admitted at the 2008 habeas hearing, which the court found "establish implicitly that the similar transaction conduct did not occur and detail a history of lying and manipulation" by Jessica. The court also ruled that Grantham's deficient investigation resulted in prejudice to Williams both because the Florida Court records constituted acquittal evidence requiring the exclusion of the similar transaction evidence under this Court's decision in Moore v. State, 254 Ga. 674, and because those documents convincingly showed that the alleged similar transaction never occurred. The Warden filed a timely notice of appeal.[4]

2. A defendant who claims that his constitutional right to the effective assistance of counsel was violated assumes a burden that, "though not

[4] Williams, who apparently was released from prison after the habeas court's decision, has not provided this Court with a current address and has not filed a brief.

30

impossible to carry, is a heavy one." Jones v. State, 292 Ga. 593, 599 (740 SE2d 147) (2013). We agree with the habeas court that Williams has carried that heavy burden here with respect to the representation that Grantham provided at his trial.[5]

(a) The Ineffective Assistance Test. An ineffective assistance of trial counsel claim has two components: the defendant must show both that his lawyer's performance was deficient and that this deficiency prejudiced the defense. See Strickland, 466 U. S. 668. To establish deficiency, the defendant must show that his lawyer discharged his duties in an objectively unreasonable way under prevailing professional norms in light of all the circumstances, see id. at 688; Jones, 292 Ga. at 599, and overcome the law's "strong presumption" that the challenged action might be considered sound trial strategy, Strickland, 466 U. S. at 689. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."

---

[5] Because Grantham represented Williams on appeal as well as at trial, the failure to raise an ineffective assistance claim on direct appeal does not preclude Williams from raising the claim in habeas corpus. See Henderson v. Hames, 287 Ga. 534, 536 (697 SE2d 798) (2010) ("[W]here the same attorney represented the [habeas] petitioner at trial and on direct appeal, the petitioner may raise an ineffective assistance of counsel claim for the first time in a habeas corpus proceeding."). See also OCGA § 9-14-48 (d) (stating that ineffective assistance of counsel claims may be procedurally barred "in the event the petitioner had new counsel subsequent to trial").

Strickland, 466 U. S. at 690. However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-691. To establish prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 687, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. Both components of an ineffective assistance of counsel claim present mixed questions of fact and law. See id. at 698; Barrett v. State, 292 Ga. 160, 167 (733 SE2d 304) (2012). Thus, we accept the habeas court's findings of fact unless they are clearly erroneous, and we then independently apply the law to the facts so found. See Humphrey v. Walker, 294 Ga. 855, 860 (757 SE2d 68) (2014); Barrett, 292 Ga. at 167.

(b) The Habeas Court's Factual Findings. Appearing on behalf of the Warden, the Attorney General asserts first that the Florida Court documents on which the habeas court based its findings of fact are not part of the record of the habeas proceedings. That assertion is true with respect to the 2005 habeas hearing; Williams offered the documents, but they were not admitted into

32

evidence. However, it was because Judge Neville refused to permit Williams a full and fair opportunity to present his evidence that we vacated the 2006 order denying Williams's habeas petition and remanded for a new hearing. The Attorney General represents that, "[a]fter this Court remanded [Williams's] habeas case for another hearing, [he] made no further attempt to admit these specific documents into evidence at his second habeas hearing." In fact, the transcript of the 2008 hearing held by Judge Gillis shows clearly that Williams offered the Florida Court documents at issue and that the court admitted them all into evidence — without objection at the time they were offered — and the documents appear as marked exhibits in the habeas record. We do not understand how the Attorney General could view the record differently.

(c)    Deficient Performance. The Warden next argues that the habeas court erred in determining that Grantham's investigation of the alleged similar transaction was deficient. We disagree. The trial and habeas hearing records show that Grantham knew that the State planned to call Jessica at trial to testify that Williams sexually molested her in Florida in 1993 when she was 11 and that the purpose of this testimony was to show Williams's intent, course of conduct, modus operandi, or common scheme to support testimony by Amanda and

33

Stephanie that he sexually molested them in 2000 when they were 14 and 13, respectively. Grantham also understood that the outcome of the trial hinged on whether the jury found the testimony of Amanda and Stephanie to be credible, presenting the jury with what the habeas court described as "a classic 'he said, she said' dilemma." Based on what Williams (and later other witnesses) told him, Grantham believed that the Florida Court had concluded that the alleged similar transaction in 1993 never happened and that the court had ordered Jessica to be returned to Williams's custody.

Grantham, however, made no effort whatsoever to investigate the documentary basis for that judicial decision, although any competent lawyer knows that courts produce documents reflecting (and usually explaining) such decisions. The filings in the 1993 Florida Court case regarding Jessica presented an obvious source of information and evidence for presentation at the similar transaction hearing to try to exclude her testimony altogether and for impeachment if Jessica was allowed to testify at trial. As the habeas court explained, the Florida Court records would have given the trial court and the jury something to corroborate the witnesses, something beyond the "he said, she

34

said" accounts of the 1993 events.[6] Moreover, those Florida records from Gadsden County, directly across the state line from Decatur County, were readily available, as revealed by the fact that Williams — operating pro se and from a Georgia prison — was able to obtain them with little difficulty.

The trial record confirms that Williams had told Grantham that useful records about the 1993 incident existed and asked the lawyer to obtain them; this issue came up in open court after the evidence was closed, and the trial court offered to continue the case for a day or two so that Grantham could obtain the documents. By that point, of course, it was too late to have the trial court exclude the similar transaction evidence. Moreover, Grantham clearly did not recognize the import of the Florida records, because he then argued — and convinced Williams — that a continuance was unnecessary because "the information [Williams] wanted subpoenaed, we feel is already in the case sufficiently." At the 2008 habeas hearing, Grantham gave no reason for his decision and advice not to accept a continuance other than his belief that he had

---

[6] Even if the Florida Court documents had proved to contain information adverse to Williams and corroborative of Jessica's account, Grantham should have wanted to know that before litigating the similar transaction issue and particularly before calling Williams and four other defense witnesses to testify about the 1993 incident.

already "pretty well established with the jury that [Williams] didn't do the 1993 incident" and that it was "perfectly clear" to the jury that Williams "had custody of [his] children again." But obtaining the Florida Court records even at that late point in the trial might at least have allowed the defense to put the documents before the jury and prevented the State from mischaracterizing the truth in its closing argument.

Under these circumstances, we agree with the habeas court that Grantham's investigation of the alleged similar transaction was professionally deficient. In Rompilla v. Beard, 545 U. S. 374 (125 SCt 2456, 162 LE2d 360) (2005), the United States Supreme Court held that a defendant's trial counsel were deficient for failing to obtain a readily available court file on a similar prior offense by their client, which counsel knew the prosecution planned to rely on at a death penalty sentencing hearing. See id. at 383-390. The Court noted that "[n]o reasonable lawyer would forgo examination of the file thinking he could do as well by asking the defendant or family relations whether they recalled anything helpful or damaging in the prior victim's testimony." Id. at 389. Concurring in the decision, Justice O'Connor explained, in terms equally applicable to the prior bad act evidence at issue in this case:

36

> [Trial counsel] did not determine that the [court] file was so inaccessible or so large that examining it would necessarily divert them from other trial-preparation tasks they thought more promising. They did not learn at the 11th hour about the prosecution's intent to use the prior conviction, when it was too late for them to change plans. Rather, their failure to obtain the crucial file "was the result of inattention, not reasoned strategic judgment."

Id. at 395-396 (O'Connor, J., concurring) (quoting Wiggins v. Smith, 539 U. S. 510, 534 (123 SCt 2527, 156 LE2d 471) (2003)).

Similarly, in Head v. Taylor, 273 Ga. 69 (538 SE2d 416) (2000), this Court held that trial counsel were deficient in failing to obtain readily available jail records to disprove an anticipated prosecution claim that the defendant's behavior in jail was normal, where counsel were on notice from their own observations of the defendant and a letter he sent to one of them that he was exhibiting signs of mental illness while in jail. See id. at 82. We believe this case is in accord with those precedents. Compare Strickland, 466 U. S. at 699 (holding that trial counsel was not deficient in deciding not to seek more character or psychological evidence than was already in hand where counsel could "reasonably surmise . . . that character and psychological evidence would be of little help"); Head v. Hill, 277 Ga. 255, 267 (587 SE2d 613) (2003) (holding that trial counsel reasonably abandoned their efforts to obtain certain

37

school records after making repeated requests for the records and after being advised, as was the trial court, that no further records existed). Trial counsel's strategic decisions are entitled to deference only to the extent that the decisions were based on reasonable investigation of the relevant facts and law. See Strickland, 466 U. S. at 690-691. Grantham's deficient performance stems from his inadequate investigation of the similar transaction evidence.[7]

(d) Prejudice Based on Collateral Estoppel. The Warden fares better in challenging the habeas court's ruling that Williams established Strickland prejudice because presentation of the Florida Court records at the similar transaction hearing would have resulted in the automatic exclusion of the similar transaction evidence based on the doctrine of collateral estoppel. In reaching this conclusion, the habeas court relied on this Court's decision in Moore v.

---

[7] We note that many cases involving allegations of deficiencies by defense counsel in obtaining records for use at trial have been resolved by pretermitting the deficient performance question and resolving the ineffective assistance claim on the ground that even if the records had been obtained and used at trial, there is no reasonable probability that they would have changed the result. See Strickland, 466 U. S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). See, e.g., White v. State, 293 Ga. 825, 827-828 (750 SE2d 165) (2013); Jones, 292 Ga. at 599; Francis v. State, 287 Ga. App. 428, 430-431 (651 SE2d 779) (2007). Because we conclude that Grantham's failure to obtain and use the Florida Court records was prejudicial to Williams, as explained below, we cannot take that approach in this case.

38

State, 254 Ga. 674 (333 SE2d 605) (1985), which addressed the admissibility of similar transaction evidence where the similar transaction consists of acts for which the defendant has previously been criminally charged by the State of Georgia and acquitted. In Moore, the defendant challenged his conviction for the armed robbery of a convenience store in Chatooga County based on the State's presentation at trial of evidence that he participated in a prior convenience store armed robbery in another Georgia county, even though he had been acquitted of that crime. See id. at 674. We held that the doctrine of collateral estoppel barred the admission of the similar transaction evidence because a review of the records of the prior proceeding showed that the prior acquittal was necessarily based on the jury's finding that Moore was not a participant in the earlier armed robbery. See id. at 677.

As the Warden correctly points out, there was no prior judgment of acquittal in this case, because criminal charges were never brought against Williams in connection with Jessica's allegations. Moreover, Moore relied on the United States Supreme Court's holding in Ashe v. Swenson, 397 U. S. 436 (90 SCt 1189, 25 LE2d 469) (1970), that the doctrine of collateral estoppel in criminal cases is an aspect of the constitutional protection against double

39

jeopardy. However, in Heath v. Alabama, 474 U.S. 82 (106 SCt 433, 88 LE2d 387) (1985), that Court held under the "dual sovereignty doctrine" that "successive prosecutions by two States for the same conduct" are not barred by the Double Jeopardy Clause. Id. at 88. See also id. at 92 ("This Court has plainly and repeatedly stated that two identical offenses are *not* the 'same offence' within the meaning of the Double Jeopardy Clause if they are prosecuted by different sovereigns."); Jackson v. State, 284 Ga. 826, 828 (672 SE2d 640) (2009). Compare OCGA § 16-1-8 (c) (statutorily barring state prosecution when the accused was formerly prosecuted in *federal* court for a crime within the "concurrent jurisdiction" of Georgia "if such former prosecution resulted in either a conviction or an acquittal and the subsequent prosecution is for the same conduct"). It follows that even if Williams had actually been charged and acquitted in a Florida criminal prosecution premised on Jessica's 1993 allegations, collateral estoppel would not have required the exclusion of the similar transaction testimony in his Georgia trial.[8]

---

[8] We note that in Salcedo v. State, 258 Ga. 870 (376 SE2d 360) (1989), this Court applied Moore to hold that collateral estoppel barred the State from presenting similar transaction evidence about a prior sexual assault for which the defendant was tried and acquitted in Florida, without consideration of Heath and the dual sovereignty doctrine. See id. at 870-871. We therefore overrule Salcedo.

40

(e)   Prejudice Based on Review of the Record.   The habeas court also

concluded, however, that Williams demonstrated Strickland prejudice even aside

from the application of collateral estoppel.   The habeas court found that

Grantham did not show the trial court at the similar transaction hearing that the

Florida Court awarded full custody of Jessica back to Williams after she made

her 1993 allegation of sexual abuse due to the lack of evidence to support her

claim, the fact that no lawyer or other professional involved in her case believed

that the alleged sexual abuse occurred, and the Florida Court's adoption of the

findings by various counselors that Jessica was a liar and manipulator who was

unworthy of belief.   The habeas court found that if the trial court had been

---

We also note that Moore's holding, which was based on collateral estoppel under the federal Double Jeopardy Clause, appears to conflict with the United States Supreme Court's subsequent decision in Dowling v. United States, 493 U. S. 342 (110 SCt 668, 107 LE2d 708) (1990). Dowling holds that a defendant's acquittal in a criminal case does not preclude the government, as a matter of double jeopardy, due process, or common-law collateral estoppel doctrine, from presenting evidence of the alleged prior bad act when trying the defendant for a different crime. See id. at 350, 353. This is because the standard of proof for a criminal conviction is higher than the standard of proof for the introduction of similar transaction evidence in a criminal trial; the determination that a crime was not proved beyond a reasonable doubt does not mean that the crime was not proved by a preponderance of the evidence or even by clear and convincing evidence. See id. at 349-350. See also Copelan v. Copelan, 294 Ga. 840, 841 (755 SE2d 739) (2014) (explaining that the collateral estoppel doctrine does not apply when the first proceeding required proof of the issue by clear and convincing evidence and the second proceeding required proof by the lower preponderance standard). However, we need not decide now whether Moore remains good law, because Williams was not in fact charged with or acquitted of any crime in the prior Florida case, and even if he had been the dual sovereignty doctrine would prevent the application of collateral estoppel.

apprised of these facts and presented with the Florida Court documents, the trial court would not have concluded that the State had made all three of the showings required to admit similar transaction evidence. See Williams, 261 Ga. at 642 ("The second affirmative showing is that there is sufficient evidence to establish that the accused committed the independent offense or act."). The habeas court also found that, even if the trial court had nevertheless admitted the similar transaction evidence, the Florida Court records would have enabled Grantham to successfully impeach Jessica's testimony by showing that Williams did not sexually abuse her in Florida when she was 11.[9]

Noting that similar transaction evidence "is very damaging evidence in a criminal case, particularly a child molestation trial," the habeas court concluded that Jessica's similar transaction testimony "eroded [Williams's] credibility and severely weakened his defense, i.e., that he was a disciplinarian and that his step-daughter and ex-wife 'wanted him gone' and that he did not commit a

---

[9] We add to this analysis the fact that although the State clearly was referring to the 1993 incident handled by the Florida Court, the account of Jessica's allegations that the State presented at the similar transaction hearing and at trial – the claim that Williams had joined her in bed and rubbed her buttocks suggestively four times on the one night – is never mentioned in the Florida Court records, which instead indicate that Jessica's allegation was that Williams kissed her, put his tongue in her mouth, and said he would give her anything she wanted if she had sex with him.

crime and that the rape [of Amanda] never occurred." As the court noted, Grantham's failure to obtain the Florida records enabled the prosecutor to insinuate falsely on cross-examination of the defense witnesses that Jessica and her younger brother were returned to Williams without any kind of court order to that effect, and to claim falsely in closing argument that Jessica did not make shifting allegations of sexual abuse against Williams and that "[t]here is not the first bit of evidence that Jessica was not believed by a Florida court."[10] The habeas court therefore concluded that Williams met his burden to show prejudice by establishing that there is a reasonable probability that, but for Grantham's deficient performance, the outcome of the trial would have been more favorable to Williams.

The Warden contends that this conclusion is flawed, because it ignored the "overwhelming evidence" of Williams's guilt, apart from Jessica's similar transaction testimony, that was presented at trial. We cannot agree. As detailed

---

[10] We note that, while Investigator Green apparently obtained a "report" on the 1993 Florida matter, it is unclear what specific document that was or whether the prosecutor or members of the prosecution team ever obtained the Florida Court records that Williams obtained after his trial. If the State was in possession of that exculpatory information at the time of trial, its failure to disclose that information to the defense would present a serious due process issue under Brady v. Maryland, 373 U. S. 83 (83 SCt 1194, 10 LE2d 215) (1963). See also Giglio v. United States, 405 U. S. 150, 154-155 (92 SCt 763, 31 LE2d 104) (1972) (holding that evidence that would impeach a State's witness comes within the Brady rule).

in Division 1 (c) above, Jessica was one of five witnesses against Williams. The only direct evidence to support his three convictions for molesting Stephanie came from Stephanie, who testified that Williams accosted her on three occasions in 2000, although she did not tell anyone about those claims until March 2002. Williams adamantly denied the charges and presented evidence suggesting that Stephanie may have fabricated her claims to get him out of the home or to enable Stephanie to go live with her father, where she was living by the time of the November 2002 trial. Williams also presented the testimony of his neighbor Schneck, who had daughters about Stephanie's age, that according to Jessica, Stephanie said Jonell was asking whether Williams had molested her or her friends in December 2001 and Stephanie had denied that Williams ever tried to kiss or touch her or her friends.

The evidence supporting Williams's conviction for molesting Amanda during the January 2000 sleepover consisted of Amanda's testimony, testimony by Joe that Amanda told him and Stephanie about the sex while they were at the Williamses' trailer the following afternoon, and testimony by Williams's ex-wife Jonell and Jessica that Williams had admitted that he had sex with Amanda. But Amanda denied telling anyone about the sex until after Stephanie's

44

allegations were raised in March 2002, and Stephanie denied talking to Amanda about the topic until shortly before the trial in November 2002. Moreover, the timelines presented by Amanda, Stephanie, and Joe differed in significant respects, and neither Stephanie nor Amanda mentioned any improper acts by Williams when separately interviewed by DFACS shortly after the sleepover, instead taking the blame on themselves for drinking and missing school. For his part, Williams adamantly denied molesting Amanda, and he offered a not entirely implausible alternative theory — that Amanda had sex with another teenager, Joe, at the sleepover, and the claim that it was Williams who had sex with Amanda was concocted by his ex-wife Jonell in December 2001 or early 2002 because she was cheating on him and wanted him out of her life.

The State presented no forensic evidence of the alleged molestations, as would be expected where the incidents were not reported until more than a year after the last one allegedly happened. The limited physical evidence that the State offered was not compelling: the photo of Stephanie and the pair of swim trunks that the State argued were too revealing shed little light on the molestation charges, and the letter that Williams wrote to Joe while the case was pending can be viewed as providing support for both the prosecution and the

45

defense.

Against this conflicting evidence, the evidence that Williams had supposedly sexually molested another young girl — another child living in his home — on a previous occasion was significant, as indicated by the fact that the prosecution called Jessica as the final witness in its case-in-chief and that Grantham then called four witnesses at the start of the defense case to try to rebuff her testimony. The defense witness testimony was useful, but not as compelling as the Florida Court records relating to Jessica's allegations that Grantham failed to obtain. The importance of the similar transaction evidence was also demonstrated by the prosecutor's repeated references to it in his closing argument — references that the Florida Court records show to be untrue in significant part.

As the Court of Appeals held on direct appeal, the evidence presented at trial was certainly sufficient legally to allow the jury to find Williams guilty as charged. See Williams, 263 Ga. App. 23-24. But we cannot say that the trial evidence was overwhelming, or that, had Jessica's similar transaction testimony been excluded or more substantially and concretely impeached, there is not a reasonable probability that the result of the trial would have been different. Like

46

the habeas court that also reviewed the record carefully, we conclude that the representation provided by Williams's trial counsel leaves us without "confidence in the outcome" of the trial. <u>Strickland</u>, 466 U. S. at 694.[11]

For these reasons, the judgment of the habeas court setting aside Williams's conviction is affirmed. Because the evidence presented at trial was legally sufficient to convict, the State may retry Williams on the charges if it chooses. See <u>Cowart v. State</u>, 294 Ga. 333, 343-344 (751 SE2d 399) (2013).

<u>Judgment affirmed. All the Justices concur.</u>

Decided July 11, 2014.

Habeas corpus. Ware Superior Court. Before Judge Gillis.

<u>Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Clint C. Malcolm, Assistant Attorney General</u>, for appellant.
Jimmie R. Williams, <u>pro se.</u>

---

[11] We note in this respect that the <u>Strickland</u> prejudice standard does not require the reviewing court to find that, but for trial counsel's deficient performance, the defendant would likely have been acquitted on all charges. It would be enough that Grantham's deficient performance creates a reasonable probability that the jury would have acquitted Williams only on the counts relating to Stephanie, for which there was less evidence than for the counts relating to Amanda, or even just hung on any charge. See <u>Strickland</u>, 466 U. S. at 695.